Claudia **ASHTON, for herself and as mother and next friend of Aisha Lindsey, individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

Samuel **PIERCE, et al., Defendants.**

**Civ. A. No. 81–719.**

United States District Court, District of Columbia.

June 22, 1982.

---

Charles S. Fax, Cheryl C. Burke, Lynda Troutman O'Sullivan, Tara Harvey, Washington, D. C., for plaintiffs.

Keith M. Werhan, Surell Brady, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This is a class action against officials of the Department of Housing and Urban Development ("HUD") challenging certain aspects of HUD's implementation of the Lead Based Paint Poisoning Prevention Act ("LPPPA"), 42 U.S.C. § 4801 et seq. (1976). The class consists of all tenants or residents of HUD-associated public housing in the District of Columbia who are, or who have, young children who have experienced or who may in the future experience lead poisoning as a result of the presence of lead-based paint in their dwelling units. Plaintiffs assert that HUD regulations issued pursuant to the LPPPA, see 24 C.F.R. Part 35 (1981), do not impose sufficiently stringent hazard elimination requirements on local public housing authorities, including the National Capitol Housing Authority ("NCHA"), the manager of HUD-associated public housing in the District of Columbia. First, plaintiffs claim the regulations are invalid because they do not define "tight" lead-based paint, i.e., paint that is not cracking, scaling, peeling or chipping, as an immediate hazard requiring immediate removal. Second, these regulations assertedly violate the LPPPA because they fail to require that residents of public housing constructed after 1950 receive written notification of the hazards of lead-based paint. In addition, plaintiffs claim that HUD has illegally failed to monitor NCHA's compliance with federal lead-based paint elimination requirements and to impose appropriate sanctions for NCHA's noncompliance.

Paint containing significant quantities of lead was commonly used to cover the interior surfaces of residential structures prior to approximately 1950. The presence of lead-based paint in older housing units presents a substantial health hazard, particularly to children. The extensive administrative record establishes that by ingesting lead-based paint, either by eating paint chips or through oral contact with surfaces covered by lead-based paint, children can become seriously ill and even die. The LPPPA, P.L. 91–695, as substantially amended in 1973 by P.L. 93–151, establishes a comprehensive federal effort to eliminate this significant health problem. This suit focuses solely on the implementation of the LPPPA as it affects federally associated public housing units in the District of Columbia.

## I. Standing

The initial question is whether plaintiffs have standing to bring this action. The defendants contend that the alleged injuries to the class from exposure to lead-based paint are not attributable to defendants' actions but instead result from violations of federal and state law by the NCHA. They also make the related argument that plaintiffs lack standing because their alleged injuries are not redressable by this suit. The Court finds that both of these arguments lack merit and that plaintiffs have standing.

Plaintiffs' alleged exposure "to the risk of lead poisoning as a result of the continued presence of lead-based paint in D.C. public housing" clearly constitutes a sufficient claim of injury in fact. Moreover, this injury can fairly be "traced" to the challenged actions of defendants. See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). Insofar as the NCHA would be required to undertake more extensive hazard elimination efforts but for HUD's allegedly illegal actions the asserted injury to the class is causally linked to HUD's actions. By the same token, because a ruling in favor of the class would lead to promulgation of more strin-

gent hazard elimination requirements the injury suffered by the class is obviously capable of being redressed by this litigation.

## II. *Elimination of Immediate Hazards*

Plaintiffs' first substantive contention is that defendants have violated the mandate of the LPPPA by failing to promulgate regulations which define "tight" lead-based paint as a hazard requiring immediate elimination in federally assisted public housing units.

Section 302 of the LPPPA provides, in relevant part:

The Secretary of Housing and Urban Development . . . shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary. Such procedures shall . . . as a minimum provide for (1) appropriate measures to eliminate as far as practicable immediate hazards due to the presence of paint which may contain lead and to which children may be exposed. . . . 42 U.S.C. § 4822 (1976).

The regulations promulgated by HUD pursuant to the LPPPA provide that "all defective paint conditions shall be assumed to be immediate hazards." 24 C.F.R. § 35.24(a) (1981). In turn, a "defective paint condition" is defined as paint on "applicable surfaces which is cracking, scaling, chipping, peeling or loose." 24 C.F.R. § 35.3(i) (1981). The regulations require that all immediate hazards be treated by thoroughly cleaning the painted surface and repainting it with two coats of non-leaded paint. 24 C.F.R. § 35.24(b)(3)(i) (1981). Lead-based paint that is not defective, *i.e.*, paint that is not cracking, scaling, chipping, peeling, or loose, need not be treated in this fashion.

Plaintiffs assert that this definition of "immediate hazards" is inconsistent with the statute, and, assuming that the regulations are within the scope of the statute, the decision to require the removal of only cracking, scaling, chipping, peeling or loose paint is arbitrary and capricious. Plaintiffs further assert that the regulations are invalid because they do not require the elimination "as far as practicable" of immediate hazards associated with lead-based paint.

## A. *"Immediate Hazards"*

■ For regulations to be valid they must be consistent with the statute under which they were promulgated. *See United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *State Farm Mutual Automobile Insurance Co. v. Department of Transportation*, 680 F.2d 206 at 222 (D.C.Cir. 1982). The Court finds that Congress specifically rejected the narrow definition of "immediate hazards" adopted by HUD in its regulations in favor of a broader definition intended to encompass "tight" paint at least under some conditions. Accordingly, the Court must declare this portion of the regulations invalid.

Section 302 was added to the LPPPA by the Lead Based Paint Poisoning Prevention Act Amendments of 1973, P.L. 93–151. A version of this section was first considered by Congress during the 92nd Congress in the form of a floor amendment offered by then-Senator Schweiker to S. 3080. 118 Cong.Rec. 20852 (1972). In relevant part, Senator Schweiker's amendment read as follows:

The Secretary of Housing and Urban Development . . . shall establish procedures to *minimize* the hazards of lead-based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary. Such procedures shall . . . provide for (1) appropriate measures to eliminate, *wherever feasible*, immediate hazards due to the presence of *cracking, scaling, peeling or loose* paint which may contain lead and to which children may be exposed. . . . *Id.* (emphasis added).

This amendment was agreed to, *id.* at 20853, and the bill was passed in the Senate

on June 14, 1972. *Id.* at 20855. The House of Representatives, however, failed to take action on the bill during the 92nd Congress. 119 Cong.Rec. 2416 (1973).

In the following Congress, Senator Kennedy reintroduced proposed amendments to the LPPPA, incorporating the amendment offered by Senator Schweiker and approved by the Senate the previous year. 119 Cong. Rec. 2419 (1973). The bill was referred to the Senate Committee on Labor and Public Welfare which on April 27, 1973, reported it with amendments and the recommendation that it be passed. *See* S.Rep.93–130, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, p. 2403. As reported by the committee section 302 read as it appears in the statute as enacted. *See* S. 607, 93d Cong., 1st Sess. § 4 (1973). Although there is no explicit statement in either the committee report or the floor debates explaining this change in language, it is apparent that the committee revised the bill in response to a decision of the Federal District Court in the Eastern District of Pennsylvania issued on March 12, 1973. *City-Wide Coalition Against Childhood Lead Paint Poisoning v. Philadelphia Housing Authority,* 356 F.Supp. 123 (E.D.Penn.1973). In that case Judge Van Artsdalen enjoined HUD from selling HUD-owned residential structures without first bringing the buildings into conformity with the regulations of the Department of Public Health of the City of Philadelphia. Those regulations required the complete removal of all lead paint from surfaces accessible to children. *Id.* at 126. By contrast, HUD regulations at the time only required scraping and repairing of "hazardous conditions" defined as "crackling [sic], scaling, peeling, and loose lead-based paint on applicable surfaces." 37 Fed.Reg. 22732 (October 21, 1972). The Court held that the local regulations were not preempted by HUD's regulations and that HUD was required to "comply with the City regulations to the same extent as is required of all other homeowners." *Id.* at 130. The Court, based on specific evidentiary findings, determined that children may be poisoned "even where the lead-based paint has been painted over and rendered tight in accordance with HUD regulations," *id.* at 126, and that HUD's failure to comply with the more stringent local regulations would create a "grave hazard." *Id.* at 127.

That Congress acted in response to the Court's specific rejection of HUD's limited definition of hazardous paint conditions is demonstrated by the remarks of Senator Kennedy, prime sponsor of the legislation, on the Senate floor after the bill had been reported out of committee in the 93d Congress:

> Last January, lawyers representing the Philadelphia coalition against childhood lead paint poisoning, presented statistics to a Federal judge showing 89 deaths in that city between 1950 and 1970, attributable to lead paint poisoning. Based on that data and other evidence U.S. District Judge Donald W. Van Artsdalen ruled that the danger to children from lead-based paint is immediate and continues each day that HUD sells a house. Thus, the judge ordered the removal of *all lead-based* paint in 1,200 federally owned residences in Philadelphia. 119 Cong.Rec. 14882 (1973) (emphasis added).

Senator Schweiker also indicated that the bill had been reconsidered in light of the Court's decision:

> Philadelphia is only one of the cities in Pennsylvania and throughout the country where lead paint poisoning is a serious and largely untreated menace. The experience there underlines the need for the legislation which the Senate will consider today to expand our ability to deal with this childhood hazard.... The bill which we are now considering will markedly increase the scope and effectiveness of this effort. 119 Cong.Rec. 14883 (1973).

The Court finds that these statements constitute sufficient evidence of the circumstances underlying Congress' repudiation of its earlier narrow definition of "immediate hazards" in favor of one which would encompass the dangers to children from tight painted surfaces containing lead.

The Court emphasizes the particular circumstances in which this question of statutory interpretation arises. A different problem would be presented if the Court were asked to determine, in the absence of the legislative history outlined above, whether HUD's definition of "immediate hazards" is inconsistent with the LPPPA. Here there is strong evidence that Congress specifically rejected legislation which would have been identical in scope to the regulations here under review. It would be inconsistent with the intent of Congress to recognize an administrative license to adopt a definition of immediate hazards deemed too narrow by Congress itself. The Court notes that the HUD Associate General Counsel came to essentially the same conclusion in a Memorandum dated May 15, 1979. Plaintiffs' Exhibit 2. The Court finds that analysis more persuasive than the arguments now advanced by defendants for the purposes of this case.

Defendants point out that the comments of numerous Senators and Congressmen reflect a particular concern with chipping and peeling paint and argue from this fact that the definition of "immediate hazards" contained in the regulations is consistent with the statute. However, little weight can be placed on these comments since they did not specifically focus on section 302. Moreover, it is fallacious to equate concern about paint chips with a lack of concern about the hazards presented by "tight" paint surfaces. As one Representative stated:

Although many units have since been repainted with low lead paints now mandated by law, every time a leak or crack appears causing surface abrasion, the original dangerous high lead paint becomes exposed and conditions are ripe for a new case of childhood lead poisoning. 119 Cong.Rec. 28408 (1973).

In other words, the frequent comments by legislators about the problems of paint chips containing lead is not inconsistent with the other evidence in the legislative history that Congress intended "immediate hazards" to encompass more than paint that had already begun to chip or peel.

Defendants also argue that Congress' failure to express any dissatisfaction when HUD's proposed definition of "immediate hazards" was brought to its attention demonstrates congressional approval of the agency's interpretation of the statute. In the course of congressional hearings on proposed amendments to the LPPPA in 1975, a HUD witness explained the effect of the proposed definition of "immediate hazards" in general terms. Lead-Based Paint Poisoning Prevention Act of 1975: Hearings Before the Subcommittee on Health of the Senate Committee on Labor and Public Welfare (hereinafter "Hearings"), 94th Cong., 1st Sess. at 37. Importantly, however, the regulations were only in proposed form at the time of the hearings; final regulations were not promulgated until July 13, 1976, more than a year later. *See* 41 Fed.Reg. 28876 (July 13, 1976). Moreover, in discussing the proposed regulations the HUD witness stated:

Let me emphasize ... that these are proposals only and prior to finalizing these regulations, the Department must comply with the procedures required by the National Environmental Policy Act of 1969. Hearings at 37.

It is simply absurd to suggest that these circumstances justify invocation of the rule that "a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has congressional approval," *Kay v. FCC*, 443 F.2d 638, 646–47 (D.C.Cir.1970); *cf. State Farm Mutual Automobile Insurance Co. v. Department of Transportation*, 680 F.2d 206 at 228–229 (D.C.Cir. 1982). ("Mere legislative silence in the face of agency action is a hazardous basis from which to infer congressional approval of the agency's interpretation of the statutes involved.")

### B. *"As Far as Practicable"*

Assuming that lead-based paint in other than a loose or peeling condition constitutes an immediate hazard, plaintiffs further assert that HUD has not carried out its man-

date to eliminate hazardous conditions "as far as practicable." The Court finds that HUD has misinterpreted the urgency of Congress' mandate and applied an improper standard in defining the types of hazards that local public housing authorities are required to eliminate from federally associated public housing.

It is apparent that HUD interpreted the statute as according it a wide latitude to select those remedial steps it found most reasonable based on its evaluation of the costs and benefits of each alternative. In explaining its approach, HUD stated that it had:

> engaged in a continuing effort to clarify the complex issues related to lead-based paint poisoning and to determine the most *cost-effective* and practical methods to best effectuate the Congressional intent expressed in section 302 of the Act. 41 Fed.Reg. 28876 (July 13, 1976) (emphasis added).

In a similar vein HUD stated that it "has adopted the methods it believes most reasonable in carrying out this mandate." Id. at 28877. The wide-ranging approach adopted by HUD in selecting among alternative lead-based paint elimination techniques is also indicated in a summary of issues presented to the Secretary of HUD prior to promulgation of the final rule here under review. · Administrative Record (hereinafter "AR") Exhibit No. 9.[1] The executive summary states that "[a]lternative, more stringent strategies are considered impractical and not cost-effective . . ." id. at 3. Similarly, this document continues:

> The [proposed] standards comprise the most cost-effective method of hazard elimination. More stringent methods, such as the removal of all paint from intact and chewable surfaces, or a pure "housing approach" are simply not cost-effective or wise social policy. Id. at 6.

See also id. at 10.

█ With due deference to HUD's interpretation of its own statutory mandate, *see*

*Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), the Court must nevertheless conclude that HUD's reliance on the test of cost-effectiveness is inconsistent with the statute. The phrase "as far as practicable," while obviously not eschewing any reliance on cost considerations, reflects Congress' determination, based on the evidence before it, that HUD regulations should tilt in favor of safety rather than cost savings. The Court holds that while HUD may consider cost and technical considerations in developing its regulations, these should require, at a minimum, that all reasonably available techniques be employed to eliminate the hazards associated with the presence of lead-based paint.

The dictionary definition of "practicable" is "possible to practice or perform" or "capable of being put into practice, done, or accomplished." Webster's Third New International Dictionary (1963). A synonym for practicable is "possible." *Id.* The courts have consistently interpreted the term "practicable" as requiring far more than a mere balancing of conveniences. *See, e.g., Dempsey v. Boys' Club of the City of St. Louis, Inc.,* 558 S.W.2d 262, 267 (Mo. App.1977); *Fast & Co. v. Industrial Commn.,* 176 Ohio St. 199, 198 N.E.2d 666, 667 (1964); *Des Moines Independent Community School Dist. v. Armstrong,* 250 Iowa 634, 95 N.W.2d 515, 517 (1959). It is of particular significance that in incorporating the phrase "best practicable control technology currently available" into the Federal Water Pollution Control Act Amendments, adopted the year prior to the LPPPA Amendments, Congress intended "to limit the use of available technology only where the additional technology necessary to achieve a marginal level of effluent reduction is *wholly out of proportion* to the cost realized." *CPC Intl., Inc. v. Train,* 540 F.2d 1329, 1341 (8th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (emphasis added).

---

1. The Court has employed the defendants' numbering system to identify items in the Administrative Record.

In the course of developing the regulations HUD itself recognized that the "as far as practicable" standard was inconsistent with an approach based on cost-effectiveness. The HUD issues paper discussed above states:

> Whether or not more stringent approaches are also 'practicable' is, of course, subject to debate. The options papers ... indicate that the Department's policy is cost-effective. AR Exhibit No. 9 at 10.

Even more revealing is a document prepared by the HUD staff discussing the various regulatory options. AR Exhibit No. 16. The document sets forth five alternatives:

> Alternative I—require *scraping* of loose, peeling, flaking paint and repainting (current regulations).
>
> Alternative II—require *removal* of all paint from loose, flaking, peeling surfaces.
>
> Alternative III—require scraping of loose, peeling, flaking paint and *removal* of all paint from chewable surfaces.
>
> Alternative IV—require *removal* of all paint from both flaking, peeling surfaces and chewable surfaces.
>
> Alternative V—require *removal* of all paint from all accessible, intact surfaces.

*Id.* at 5. The document states that Alternative II offers a more permanent solution than scraping and repainting and "[m]ay be a suitable approach i[f] we wanted to raise our current standard within a 'practicable' context." *Id.* at 9. Alternative III is characterized not as impracticable, but as "less cost-effective." *Id.* at 11. Not until Alternative IV, the removal of lead-based paint from both chewable and flaking surfaces, is it stated that the option "[d]oes not appear to be 'practicable' in terms of continued FHA activity." *Id.* at 12. Alternative V is also termed "impracticable" in terms of FHA activity and, in addition, is found to place an "unreasonable burden" on the FHA fund. *Id.* at 13, 14. Only the more

stringent alternatives are rejected based on the legal standard of impracticability. By implication, Alternatives II and III, though perhaps not cost-effective, were determined to be practicable, as the statute requires. Indeed, the HUD staff expressly questioned whether regulations not requiring removal of intact paint from "chewable" surfaces would be found adequate to satisfy the "as far as practicable" standard. *Id.* Attachment A at 33. In discussing the alternative strategies available the HUD staff suggested that legislation might be sought which would " 'roll back' hazard elimination requirements to reflect existing regulations." *Id.* Attachment A at 46–47.

\* \* \*

In summary, the overwhelming weight of the legislative history establishes that HUD has not acted consistent with its mandate under the LPPPA in only requiring elimination of lead-based paint hazards when the painted surface is in a "defective" condition. HUD will be directed to undertake further rulemaking to establish appropriate procedures for the elimination of lead-based paint hazards in federally associated public housing, including so-called tight paint.[2]

### III. *Notice*

▉▉▉▉ Plaintiffs' second substantive challenge to the regulations is that they do not require that occupants of public housing constructed during or after 1950 receive notice of the hazards of lead-based paint poisoning. In relevant part the 1973 amendments to the LPPPA provide:

> The Secretary of Housing and Urban Development ... shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary. Such procedures shall apply to all such housing constructed prior to

---

**2.** The Court emphasizes that in carrying out further rulemaking HUD retains substantial discretion to adopt regulations of a scope and effect it deems appropriate. The Court simply holds that HUD's complete failure to address the hazards associated with "tight" paint containing lead is contrary to the intent of Congress.

1950 and shall as a minimum provide for ... (2) assured notification to purchasers and tenants of such housing of the hazards of lead based paint, of the symptoms and treatment of lead based paint poisoning, and of the importance and availability of maintenance and removal techniques for eliminating such hazards. Such procedures may apply to housing constructed during or after 1950 if the Secretary determines, in his discretion, that such housing presents hazards of lead based paint.... 42 U.S.C. § 4822 (1976).

Although plaintiffs acknowledge that the final sentence of the quoted language grants the Secretary a certain latitude, they contend that the Secretary is required, at a minimum, to investigate whether notice should be given to occupants of pre-1950 housing and to require such notice, if appropriate; they contend that the Secretary's failure to conduct such an investigation and to extend the notice provision to post-1950 housing was arbitrary and contrary to law. Plaintiffs further argue that in view of the fact that lead hazard elimination requirements discussed above in section II apply to post-1950 housing, it is arbitrary and capricious not to impose in addition the less stringent requirement that occupants of such housing receive notice of the possible hazards of lead in their dwelling units. Defendants respond that the issue has been "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1976), and therefore the Secretary's decision not to apply the notice requirement to post-1950 housing is not subject to judicial review.

It is firm law that this exception to the general rule that judicial review of agency action shall be available is a narrow one, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), and that it may be invoked only upon a clear and convincing showing that to do so would further the intent of Congress. *Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977). It applies in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to

apply." 401 U.S. at 410, 91 S.Ct. at 820. As stated by the Court in *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970):

> Whether agency action is reviewable often poses difficult questions of congressional intent; and the Court must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion. *Id.* at 165, 90 S.Ct. at 837.

■ The Court finds that the express language of the statute is dispositive of the issue presented. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The statutory directive that notice procedures "*may* apply ... if the Secretary determines, *in his discretion*, that such housing presents hazards ...*" could not in clearer terms indicate that the matter is left to the sole responsibility of the agency. *Cf. Gatter v. Nimmo*, 672 F.2d 343 (3d Cir. 1982). The statute provides no substantive standard according to which the Court can assess the reasonableness of the Secretary's exercise of his discretion. There is simply no law to apply.

This conclusion is buttressed by other considerations. The decision whether or not to require notice to occupants of post-1950 housing entails a complex evaluation of technical, scientific and financial considerations that the Court is ill-equipped to resolve. Moreover, as is frequently the case in the closely analogous problem of review of an agency decision not to promulgate a rule, *see NRDC v. SEC*, 606 F.2d 1031 (D.C. Cir.1979), the administrative record in this case provides an inadequate basis for effective review. The Secretary could have required that notice be sent to occupants of all or some subset of post-1950 public housing in the District of Columbia. The failure of the agency in the course of the administrative proceedings to focus on the notice issue and the alternative methods for implementing a notice requirement counsels

strongly against reviewability. *See id.* at 1046–47.[3]

■ The Court rejects plaintiffs' contention that section 302 mandates that the Secretary determine whether or not to apply notice requirements to post-1950 housing and this requirement in turn implicitly requires the Secretary to undertake some type of investigation to determine whether notice is appropriate. Insofar as the Secretary has determined not to apply the notice requirement to post-1950 housing he has obviously fulfilled any obligation he may have to reach some determination. The statute does not prescribe any particular type of proceeding in order to arrive at such a determination. It is obviously not the role of the Court to impose a particular decision-making process on an agency where none has been provided by Congress. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

### IV. *HUD's Enforcement Responsibilities*

Finally, plaintiffs assert that the defendants have failed to monitor the compliance of the National Capitol Housing Authority with federal lead-based paint elimination requirements and to enforce such requirements against the NCHA through the imposition of appropriate sanctions. Plaintiffs seek, in effect, an injunction directing defendants to monitor the activities of the NCHA under these regulations and to impose appropriate sanctions.

■ Plaintiffs correctly assert that the terms of the Annual Contribution Contracts between HUD and the NCHA afford the plaintiffs a legal basis for seeking injunctive relief against HUD for failing to enforce the requirements of the lead-based paint regulations. Section 201 of this con-

tract provides that "[t]he Local Authority shall at all times operate each Project (1) solely for the purpose of providing decent, safe, and sanitary dwellings ... within the financial reach of Families of Low Income ...;" section 209 provides that the "Local Authority shall at all times maintain each Project in good repair, order, and condition." Plaintiffs Exhibit No. 9. The United States Court of Appeals for this Circuit has held that "[i]t is the responsibility of HUD to police the performance of these contracts...," *Knox Hill Tenant Council v. Washington*, 448 F.2d 1045, 1048 (D.C.Cir. 1971); *see also Housing Authority of Omaha v. United States Housing Authority*, 468 F.2d 1, 8 (8th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973), and, more to the point, tenants of public housing have a right to seek judicial enforcement of the terms of such contracts. 448 F.2d at 1057–58. Insofar as elimination of hazards associated with the presence of lead-based paint is encompassed by the NCHA's contractual obligation "to provide decent, safe, and sanitary dwellings," plaintiffs have a right to seek a judicial order requiring HUD to enforce these regulations against the NCHA.

Sufficient facts have been presented to the Court through uncontradicted portions of plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue (hereinafter "SMF") to demonstrate that HUD has failed effectively to monitor compliance with the regulations or to seek their enforcement. HUD has no system for gathering data on the number of HUD-associated housing units subject to the lead-based paint regulations, the number of HUD-associated housing units that have been inspected for lead-based paint, or the number of HUD-associated housing units

---

**3.** Assuming *arguendo* that the Secretary's decision not to require notice to occupants of post-1950 housing is subject to judicial review, the Court finds that the decision was not arbitrary or capricious. The breadth of discretion granted by the statute and the fact that this suit challenges the product of informal rulemaking proceedings dictate a particularly deferential standard of review. *See NRDC v. SEC*, 606

F.2d 1031, 1049 (D.C.Cir.1979). Although the administrative proceedings did not focus on the issue of notice for occupants of post-1950 housing there is ample evidence in the record that housing constructed prior to 1950 presents a greater hazard due to lead-based paint. Viewing the record as a whole the Court finds the Administrator's decision rational.

that have been cleared of lead-based paint hazards. SMF ¶ 25. Moreover, HUD has made no determination whether the NCHA has in fact complied with the inspection and elimination requirements. SMF ¶ 24. Specifically, HUD has no procedure to determine if NCHA has inspected each unit of HUD-associated public housing before occupancy and eliminated immediate hazards as required by 24 C.F.R. § 35.24(b)(1)(V) and .24(b)(3). *Id.*

 The issue then is whether plaintiffs are entitled to the injunctive relief they seek. An injunction, of course, is an equitable remedy which the Court may withhold in its discretion based on its assessment of the particular case. *Weinberger v. Romero-Barcelo*, —— U.S. —— at ——–——, 102 S.Ct. 1798 at 1802–03, 72 L.Ed.2d 91 (1982). A liberal exercise of such discretion is particularly appropriate where, as here, the plaintiffs seek to compel the defendants to perform an investigative and quasi-prosecutorial function. *Cf. Nader v. Saxbe*, 497 F.2d 676, 679 n. 18 (D.C.Cir. 1974).

In view of the Court's ruling that the current regulations are inconsistent with the statutory mandate it would not be in the public interest to require HUD to mount an effort to seek compliance with these now invalid regulations. The Order attached hereto requires HUD promptly to initiate new rulemaking proceedings to develop lead-based paint regulations that comply with the statutory mandate. In terms of effective deployment of limited federal resources the obvious better course is to await the development of new regulations before HUD initiates extensive enforcement efforts. Moreover, it is somewhat speculative whether granting the injunctive relief requested would successfully mitigate the risk that children will ingest lead-based paint; plaintiffs in this action do not seek actual implementation of the requirements of the regulations by the NCHA but merely that HUD determine whether the NCHA is complying with the regulations and, if NCHA is not, that HUD wield its authority to enforce sanctions against the NCHA to spur greater compliance.

In view of the foregoing considerations the Court will require only that HUD, in the course of further rulemaking proceedings, identify the specific steps it will take to monitor and ensure compliance by local housing authorities with the revised lead-based paint elimination requirements. The Court assumes that pending completion of these new regulations HUD will recognize its continuing responsibility to achieve compliance with the requirements of the LPPPA.