716 F.2d 56
 70 A.L.R.Fed. 341, 230 U.S.App.D.C. 252
 Claudia ASHTON, for herself and as mother and next friend of
Aisha Lindsey, individually and on behalf of all
others similarly situated,
Appellees/Cross Appellants
v.
Samuel PIERCE, Secretary, U.S. Department of HUD, et al.,
Appellants/Cross Appellees.
 Nos. 82-1988, 82-2048.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 25, 1983.
Decided Aug. 26, 1983.
As Amended Nov. 4, 1983.*
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 81-719).
 Michael J. Singer, Atty., U.S. Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Anthony J. Steinmeyer, Atty., U.S. Dept. of Justice, Washington, D.C., were on brief, for HUD, et al.
 Cheryl C. Burke and Neal J. Tonken, Washington, D.C., with whom Charles S. Fax, Washington, D.C., was on brief, for Ashton, et al.
 Before TAMM, GINSBURG and BORK, Circuit Judges.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 The issue in this case is whether the district court correctly held (1) that certain regulations promulgated by the Department of Housing and Urban Development (the Department) are invalid because they are inconsistent with the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. Secs. 4801-4846 (1976); (2) that the failure of the Secretary of Housing and Urban Development (the Secretary) to give notice of lead paint hazards to residents of post-1949 housing is unreviewable; and (3) that the Department has failed to fulfill its duty to monitor and enforce compliance with its regulations by the local housing authority. We affirm the district court's order.
 
 I. BACKGROUND
 
 2
 Lead poisoning, the accumulation of lead in body tissues, is a serious health problem, particularly for children. Lead poisoning in children may affect the central nervous system, causing convulsions, coma, and permanent brain damage or death. Approximately two hundred children in the United States die each year from lead poisoning, and as many as ten thousand additional children suffer significant adverse effects from the condition. Lead-Based Paint Hearing, Department of Housing and Urban Development at 7 (May 20-24, 1974) (testimony of Dr. Richard W. Roberts, Director, National Bureau of Standards), Administrative Record (A.R.) at 419. Lead poisoning in children is caused primarily by the ingestion of lead-based paint from walls and other surfaces in the home. Children usually ingest the paint by eating chips or flakes from deteriorating painted surfaces or by chewing on painted surfaces such as window sills and door frames. This behavior may result from simple curiosity, teething pain, or pica, a compulsive desire to eat nonfood substances. See generally Eden, "Lead Poisoning," in 1982 Encyclopedia Britannica Medical and Health Annual 377.
 
 
 3
 Congress first addressed the public health problem of lead poisoning in 1971, when it passed the Lead-Based Paint Poisoning Prevention Act, Pub.L. No. 91-695, 84 Stat. 2078 (1971), which provided federal grants to local lead poisoning prevention programs, established a federal research and demonstration project, and authorized agency action to prohibit the use of lead-based paint in federally owned or federally assisted housing. In 1973 Congress strengthened and broadened the Act, see S.Rep. No. 130, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, p. 2403, by adding section 302, which provides:
 
 
 4
 The Secretary of Housing and Urban Development ... shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary. Such procedures shall apply to all such housing constructed prior to 1950 and shall as a minimum provide for (1) appropriate measures to eliminate as far as practicable immediate hazards due to the presence of paint which may contain lead and to which children may be exposed, and (2) assured notification to purchasers and tenants of such housing of the hazards of lead based paint, of the symptoms and treatment of lead based paint poisoning, and of the importance and availability of maintenance and removal techniques for eliminating such hazards. Such procedures may apply to housing constructed during or after 1950 if the Secretary determines, in his discretion, that such housing presents hazards of lead based paint. The Secretary may establish such other procedures as may be appropriate to carry out the purposes of this section. Further, the Secretary shall establish and implement procedures to eliminate the hazards of lead based paint poisoning in all federally owned properties prior to the sale of such properties when their use is intended for residential habitation.
 
 
 5
 Act of Nov. 9, 1973, Pub.L. No. 93-151, sec. 4, Sec. 302, 87 Stat. 565, 566 (codified at 42 U.S.C. Sec. 4822 (1976)).
 
 
 6
 In 1976 the Department promulgated regulations governing its performance under section 302. 41 Fed.Reg. 28,876 (July 13, 1976). The regulations require the Department to eliminate (by repainting after scraping, sanding, or brushing) only "immediate hazards" found on "applicable surfaces." 24 C.F.R. Sec. 35.24(b)(3)(i) (1981). An "immediate hazard" is defined as "paint (which may contain lead) on applicable surfaces which is cracking, scaling, chipping, peeling or loose." Id. Sec. 35.3(i). "Applicable surfaces" are "all interior surfaces, whether accessible or not, and those exterior surfaces ... which are readily accessible to children under 7 years of age." Id. Sec. 35.3(g).
 
 
 7
 The regulations require complete removal of lead-based paint from a surface or complete recovering of the painted surface with a nonporous material only when "the paint film integrity of the applicable surface cannot be maintained." Id. Sec. 35.24(b)(3)(ii). Thus, the regulations fail to authorize removal, recovering, or repainting of lead-based painted surfaces that are accessible to children if the paint surface is "tight," that is, not "cracking, scaling, chipping, peeling or loose." Appellees, individual tenants of public housing operated by the National Capital Housing Authority (the Authority) with assistance from the Department, sued the Secretary and other Department officials on behalf of their class. They assert that these provisions are inconsistent with the statutory directive that the Department "eliminate as far as practicable immediate hazards due to the presence of paint which may contain lead and to which children may be exposed." 42 U.S.C. Sec. 4822 (1976). Further, appellees contend that the Department has been derelict in its asserted duty to monitor and enforce compliance with the lead-based paint regulations by the Authority.
 
 
 8
 The regulations also prescribe the content of the notice regarding the dangers of lead-based paint to be given to tenants and purchasers of federally owned or federally assisted housing. 24 C.F.R. Secs. 35.1-.5 (1981). Under these regulations, the prescribed notice must be given only to tenants and purchasers of housing constructed before 1950. Id. Sec. 35.5(a). There is no requirement or authorization for the notice to be given to tenants or purchasers of housing constructed during or after 1950. Because neither the regulations nor the administrative record reveals a determination by the Secretary whether "such housing presents hazards of lead based paint," 42 U.S.C. Sec. 4822 (1976), appellees argue that the notice provisions violate the Act.
 
 
 9
 District Judge Gerhard A. Gesell granted partial summary judgment for appellees, finding (1) that the regulations are deficient in not treating intact lead-based paint accessible to children as an immediate hazard under the Act; (2) that the regulations failed to prescribe sufficient steps to eliminate accessible lead-based paint "as far as practicable"; and (3) that the Department has unlawfully failed to monitor and enforce the local housing authority's compliance with the lead-based paint regulations. Ashton v. Pierce, 541 F.Supp. 635 (D.D.C.1982). The district court ordered the Department "to undertake further rulemaking to establish appropriate procedures for the elimination of lead-based paint hazards in federally associated public housing, including so-called tight paint." Id. at 642 (footnote omitted). Although the district court refused to order the Department to begin monitoring and enforcing compliance with the current regulations, it instructed the Department on remand to "identify the specific steps it will take to monitor and ensure compliance by local housing authorities with the revised lead-based paint elimination requirements." Id. at 645. In addition, the district court granted partial summary judgment for the Department, rejecting appellees' argument that the Act requires the Secretary to determine whether lead-based paint in post-1949 housing is a health hazard and, if so, to give notice of the hazard to tenants and purchasers. Id. at 642-44.
 
 II. ANALYSIS
 
 10
 In reviewing the district court's grants of summary judgment, we must determine whether there were any disputed issues of material fact and whether the prevailing party was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Bloomgarden v. Coyer, 479 F.2d 201, 206-07 (D.C.Cir.1973). Since there were no disputed issues of material fact, we review each of the district court's legal conclusions in turn.
 
 
 11
 A. The Definition of "Immediate Hazards"
 
 
 12
 We first review whether appellees were entitled to judgment as a matter of law on the issue of whether the Department's complete exclusion of intact lead-based paint accessible to children from the definition of "immediate hazards" is inconsistent with section 302 of the Act. The district court correctly noted that "[f]or regulations to be valid they must be consistent with the statute under which they were promulgated." Ashton v. Pierce, 541 F.Supp. at 638. The question is purely one of statutory construction: did Congress intend the term "immediate hazards" to encompass more than the defective paint conditions identified in the Department's regulations?
 
 1. The District Court's Reasoning
 
 13
 To resolve this question, the district court examined the legislative history of section 302. The court noted that section 302 originated in the Ninety-Second Congress as a floor amendment to S. 3080 by Senator Schweiker. The amendment required the Department merely to "minimize" the dangers of lead-based paint, including elimination "wherever feasible" of "immediate hazards due to the presence of cracking, scaling, peeling, or loose paint which may contain lead and to which children may be exposed." S. 3080, sec. 8, Sec. 302, 92d Cong., 1st Sess., 118 Cong.Rec. 20,852 (1972). The bill as amended passed the Senate, 118 Cong.Rec. 20,855 (1972), but the House failed to take action on the bill during the Ninety-Second Congress, see 119 id. 2416 (1973) (remarks of Sen. Kennedy).
 
 
 14
 The bill as passed by the Senate was introduced as S. 607 in the Ninety-Third Congress and was referred to the Senate Committee on Labor and Public Welfare. The Committee amended section 302 to its present form, requiring the Department to "eliminate" the hazards of lead-based paint, including elimination "as far as practicable" of "immediate hazards due to the presence of paint which may contain lead and to which children may be exposed." S. 607, sec. 4, Sec. 302, 93d Cong., 1st Sess., 119 Cong.Rec. 14,881 (1973). This version of section 302 appeared in the bill passed by the Senate, 119 Cong.Rec. 14,884 (1973), in the bill passed by the House, see id. at 28,416, and in the bill adopted by the Conference Committee and enacted, see H.R.Rep. No. 522, 93d Cong., 1st Sess. (1973) U.S.Code Cong. & Admin.News 1973, p. 2403 (Conference Report).
 
 
 15
 Although neither the Senate committee report nor the floor debate on the bill explained why the language of section 302 had been changed, the district court relied heavily on the deletion of the adjectives "cracking, scaling, peeling, or loose" from the phrase modifying "immediate hazards" in determining the scope of the hazards Congress intended the Department to eliminate. Ashton v. Pierce, 541 F.Supp. at 638. In the court's view, the revision of section 302 demonstrated Congress's intention that the Department broaden its procedures to eliminate not only hazards due to lead-based paint in a defective condition but also hazards resulting from intact lead-based paint accessible to children. Id. at 639.
 
 
 16
 The district court believed that the shift in Congress's focus from the condition of the paint to the paint's accessibility to children was due to Congress's awareness of the decision in City-Wide Coalition Against Childhood Lead Paint Poisoning v. Philadelphia Housing Authority, 356 F.Supp. 123 (E.D.Pa.1973). In that case the district judge found as a fact that children can contract lead poisoning even from intact lead paint and held that the Department had a duty to comply with Philadelphia's local lead-based paint regulations, which required the complete removal of all lead-based paint accessible to children regardless of its condition. Id. at 126-27. In the floor debate on S. 607, both Senator Kennedy, the sponsor of the bill, and Senator Schweiker referred to Philadelphia's experience. 119 Cong.Rec. 14,88 2 (1973) (remarks of Sen. Kennedy); id. at 14,883 (remarks of Sen. Schweiker). The district court concluded that this legislative history demonstrates that Congress intended the term "immediate hazards" to "encompass the dangers to children from tight painted surfaces containing lead." Ashton v. Pierce, 541 F.Supp. at 639.
 
 2. The Department's Arguments
 
 17
 In attacking this conclusion, the Department first argues that because section 302 refers to both "hazards" and "immediate hazards," the term "immediate hazards" cannot be interpreted to include all the "hazards" of lead-based paint since such an interpretation would render the word "immediate" superfluous. Brief for Appellants at 22-24. Second, the Department contends that the phrase "cracking, scaling, peeling, or loose" was deleted from section 302 solely to give the Department more discretion in defining "immediate hazards" and that the legislative history shows that even after the revision of section 302, Congress was primarily concerned with hazards posed by defective paint. Id. at 25-32. Finally, the Department argues that Congress ratified the Department's definition of "immediate hazards" by failing to comment on the proposed definition when it was brought to the attention of the Senate Subcommittee on Health in 1975. Id. at 32-34.
 
 3. Our Analysis
 
 18
 We believe the district court was correct in concluding that "Congress specifically rejected the narrow definition of 'immediate hazards' adopted by [the Department] in its regulations in favor of a broader definition intended to encompass 'tight' paint at least under some conditions." Ashton v. Pierce, 541 F.Supp. at 638. Our task is to ascertain Congress's intent in section 302, and to do so we must first resort to the plain language of the Act. CBS, Inc. v. FCC, 453 U.S. 367, 377, 101 S.Ct. 2813, 2820, 69 L.Ed.2d 706 (1981); see Tennessee Valley Authority v. Hill, 437 U.S. 153, 172-74, 98 S.Ct. 2279, 2290-91, 57 L.Ed.2d 117 (1978). Section 302 requires the Department to eliminate "immediate hazards due to the presence of paint which may contain lead and to which children may be exposed." 42 U.S.C. Sec. 4822 (1976). We believe Congress intended this clause to delineate precisely the scope of the hazards that must be eliminated. In the usual case, giving the phrase "to which children may be exposed" its usual and ordinary meaning would adequately answer the question of what lead-based paint Congress intended the Department to eliminate and would exhaust our inquiry. See Symons v. Chrysler Corp. Loan Guarantee Board, 670 F.2d 238, 241 (D.C.Cir.1981); see also United States v. Lipscomb, 702 F.2d 1049 at 1073-76 (D.C.Cir.1983) (MacKinnon, J., concurring specially). Given the broad ordinary meaning of "exposed," however, see Webster's Third New International Dictionary 802 (1971) ("open to view"; "not shielded or protected"), we must look further to resolve the question of what Congress understood the phrase "to which children may be exposed" to mean. See Alabama v. Tennessee Valley Authority, 636 F.2d 1061, 1066 (5th Cir.1981).
 
 
 19
 We read the challenged regulations as an agency determination that children are "exposed" to lead paint only when the paint is in a defective condition. Our reading of the legislative history convinces us that Congress understood a broader range of conditions to constitute exposure of children to lead paint and intended that these conditions be eliminated. Although we are not as certain of the import of the legislative history as was the district court, we agree that the change in the pertinent language of section 302 made by the Senate committee is the most revealing indicator of congressional intent. The elimination of the "cracking, scaling, peeling, or loose" language, which tracked the language of Department lead-based paint regulations then in force, see 37 Fed.Reg. 16,872 (Aug. 22, 1972), amended by id. at 24,112 (Nov. 14, 1972), is evidence that Congress did not wish to adopt the Department's definition of "immediate hazards." The retention of the "due to" clause modifying "immediate hazards" is also evidence that, contrary to the Department's contention, Congress did not wish merely to confer on the Department vast discretion to define "immediate hazards." Indeed, Congress intended this portion of section 302 to be a minimum standard of performance for the Department, and it would be anomalous for Congress to incorporate broad agency discretion into a minimum statutory standard.
 
 
 20
 Furthermore, the absence of any adequate congressional explanation for the change in language, see S.Rep. No. 130, 93d Cong., 1st Sess. (1973), does not vitiate our conclusion that the change is significant. Symons v. Chrysler Corp. Loan Guarantee Board, 670 F.2d 238, 242 (D.C.Cir.1981). We may not assume that Congress, through the Senate committee, made such a substantial and obvious change in the bill for no reason at all. The shift in section 302's focus from the condition of the lead-based paint to children's exposure to lead-based paint suggests that Congress perceived that children can be "exposed" to lead-based paint even where the paint is not defective.
 
 
 21
 In fact, as the district judge noted, there is evidence that at the time the Senate committee made the crucial revision in section 302, committee members had become aware of the City-Wide Coalition case, in which the district judge specifically found that children can contract lead poisoning by chewing on intact lead-based paint. City-Wide Coalition Against Childhood Lead Paint Poisoning v. Philadelphia Housing Authority, 356 F.Supp. 123, 126-27 (E.D.Pa.1973). In floor debate on the reported version of the bill, Senator Kennedy remarked that "the judge ordered the removal of all lead-based paint in 1,200 federally owned residences in Philadelphia," 119 Cong.Rec. 14,882 (1973) (emphasis added), and Senator Schweiker noted that "[t]he experience there underlines the need for the legislation which the Senate will consider today to expand our ability to deal with this childhood hazard," id. at 14,883.
 
 
 22
 In addition, Congress's awareness that intact lead paint poses a hazard to children is demonstrated by section 401 of the Act, which originated as a Senate committee amendment to S. 3080 in the Ninety-Second Congress. See 118 Cong.Rec. 20,852 (1972) (remarks of Sen. Schweiker). Section 401 mandates federal agency action to prohibit the use of lead-based paint on "any cooking utensil, drinking utensil, or eating utensil," 42 U.S.C. Sec. 4831(a) (1976), and on "any toy or furniture article," id. Sec. 4831(c). Explaining these provisions on the floor of the Senate, Senator Schweiker noted the propensity of small children to "chew or gnaw" on the edges of their cribs: "I know that many parents will remember that bare spots are left on the headboard and footboard of a crib from children chewing on it.... This presents a rather serious health hazard when ... a small child might come into contact unwittingly with that lead-based paint." 118 Cong.Rec. 20,853 (1972).
 
 
 23
 Our interpretation of "immediate hazards" is consistent with Congress's avowed purpose to strengthen the 1970 Act. See S.Rep. No. 130, 93d Cong., 1st Sess. (1973); 119 Cong.Rec. 14,883 (1973) (remarks of Sen. Schweiker). Each of the three other changes in section 302 made by the Senate committee appear to strengthen the Act: the change from "minimize" to "eliminate as far as practicable"; the change from "eliminate, wherever feasible" to "eliminate as far as practicable"; and the addition of two sentences granting the Secretary authority to "establish such other procedures as may be appropriate to carry out the purposes of this section" and to apply the lead-based paint elimination procedures to a broader range of federally associated housing. Construing "immediate hazards" to encompass more than just defective lead paint is thus consistent with the tenor of the other committee changes and furthers Congress's purpose. See Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).
 
 
 24
 Moreover, our interpretation of "immediate hazard" does not render the word "immediate" superfluous, as the Department alleges. The difference between "hazards" and "immediate hazards" is revealed by the plain language of section 302: "immediate" hazards are those resulting from lead-based paint "to which children may be exposed." Lead-based paint to which children cannot be exposed is only a "hazard," not an "immediate hazard." Similarly, our interpretation is not defeated by the numerous references to the hazards of defective paint made by members of both Houses, even after the Senate committee's revision of section 302. See Brief for Appellants at 29 & n. 12 (citing Members' remarks). References to one type of hazard do not indicate a lack of concern about other types of hazards. Indeed, immediately after remarking on S. 3080's provisions for eliminating lead paint from furniture and toys, Senator Schweiker noted that "cracking, scaling, peeling, or loose ... is the condition in which [paint] can most easily be eaten by small children ...." 118 Cong.Rec. 20,853 (1972) (emphasis added).
 
 
 25
 We also reject the Department's contention that Congress ratified the challenged regulations when it failed to amend the Act after the Department informed the Senate Subcommittee on Health in 1975 of its proposed definition of "immediate hazards." The short answer to this argument is that Congress cannot by its silence ratify an administrative interpretation that is contrary to the plain meaning of the Act. See Securities and Exchange Commission v. Sloan, 436 U.S. 103, 119-22, 98 S.Ct. 1702, 1712-13, 56 L.Ed.2d 148 (1978). Certainly, the weak indicators of congressional intent noted by the Department cannot overcome our conclusion, based on the Act's plain language as illuminated by the legislative history, that Congress intended the Department to eliminate at least lead-based paint that is accessible to, and chewable by, children.
 
 B. The "As Far as Practicable" Standard
 
 26
 The district court held that the Department had failed to fulfill its statutory duty to establish procedures to eliminate the hazard of accessible intact paint "as far as practicable." In the court's view, the agency record revealed that the Department had applied an incorrect standard, requiring only the "most practicable" elimination procedures rather than requiring elimination procedures "as far as practicable." Ashton v. Pierce, 541 F.Supp. at 640-42. The court also held that the administrative record reflected an implicit determination that removal of intact paint from chewable surfaces is "practicable." Id. at 642.
 
 
 27
 We agree with the district court that the challenged regulations are invalid because they are based upon an erroneous standard. The Department's statement accompanying the final regulations is replete with references to "the most cost-effective and practical methods" of eliminating lead paint hazards. 41 Fed.Reg. 28,876-78 (July 13, 1976). The method of hazard elimination embodied in the regulations--repainting after removal of defective lead paint--is declared to be "the most practicable" method. Id. at 28,877, 28,878. The agency record reveals that the practicability of various elimination requirements was judged on a cost-benefit basis. E.g., Memorandum to Carla A. Hills from Gerald D. Levine 1-2 (HUD Feb. 9, 1976) ("huge costs and limited benefits"), A.R. at 125-26; Issues Paper: Lead-Based Paint 2 (HUD Feb. 2, 1976) ("The standards comprise the most cost-effective method of hazard elimination. More stringent methods ... are simply not cost-effective ...."), A.R. at 128; id. at 6 ("[T]he Department's policy is cost-effective."), A.R. at 132; id. at 9 (removal of chewable intact paint "impractical" because of "costs"), A.R. at 135; Background Options Paper (removal of intact paint from chewable surfaces is "less cost-effective"), A.R. at 272. Thus, the Department did not expressly apply the correct statutory standard in its rulemaking proceeding.
 
 
 28
 Nevertheless, the Department argues that the "most practicable" standard it applied effectuates Congress's intent as expressed in the statutory "as far as practicable" standard. As evidence that Congress meant the phrase "as far as practicable" to mean "most practicable," the Department cites (1) Congress's concern about the costs of the elimination program and its refusal to appropriate as much money as the Department requested for the program, Brief for Appellants at 45-48; and (2) Congress's failure to disapprove the Department's interpretation of the "as far as practicable" standard when it was brought to the attention of the Senate Subcommittee on Health in 1975, id. at 48-52. We are singularly unpersuaded by the Department's argument. There is not a shred of contemporaneous legislative history to indicate that Congress intended the phrase "as far as practicable" to have other than its plain meaning. In plain language Congress commanded that if it is "practicable" to eliminate an immediate hazard, that hazard must be eliminated. The statute admits of no exceptions to the required elimination procedures on the basis of the degree of practicability. Neither Congress's concern about the cost of the elimination program nor congressional silence in the face of the Department's interpretation of the statute can overcome the clear statutory directive.
 
 
 29
 We conclude, therefore, that the regulations cannot stand in light of the Department's use of an incorrect legal standard in determining whether it is "practicable" to eliminate the immediate hazard of intact lead paint. We decline, however, to affirm the district court's finding that the administrative record establishes that elimination of chewable intact paint is in fact practicable. The district court based its finding on a Department Background Options Paper, which listed five alternative proposals for the elimination of lead-based paint. A.R. at 265. There was no finding in the Options Paper that any of the first three alternatives--the third of which called for scraping of defective paint and removal of intact paint from chewable surfaces--was impracticable. Only the more stringent fourth and fifth alternatives were found to be not " 'practicable' in terms of continued FHA activity." A.R. at 272, 273. The district court noted, "By implication, Alternatives II and III, though perhaps not cost-effective, were determined to be practicable, as the statute requires." Ashton v. Pierce, 541 F.Supp. at 642.
 
 
 30
 We are loath to declare that a fact has been established by mere implication in the administrative record, particularly when the agency record demonstrates that the Department focused primarily on cost in determining practicability. See, e.g., Issues Paper: Lead-Based Paint 9 (Feb. 2, 1976), A.R. at 135. It is peculiarly within the expertise of the Department to determine the practicability of a given elimination procedure. We agree with the district court that the "as far as practicable" standard allows the Department "to consider cost and technical considerations in developing its regulations" and that the threshold of practicability is reached if there exist "reasonably available techniques" for eliminating the hazard. Ashton v. Pierce, 541 F.Supp. at 641. The ambiguity of the administrative record here does not allow us to say as a matter of law that the Department has already made the determination of practicability.
 
 
 31
 We affirm the district court's order that the Department "undertake further rulemaking to establish appropriate procedures for the elimination of lead-based paint hazards in federally associated public housing, including so-called tight paint." Ashton v. Pierce, 541 F.Supp. at 642 (footnote omitted). Like the district court, we note that "in carrying out further rulemaking [the Department] retains substantial discretion to adopt regulations of a scope and effect it deems appropriate." Id. at n. 2. We simply hold that the Department's "complete failure to address the hazards associated with 'tight' paint containing lead is contrary to the intent of Congress." Id.
 
 C. Notice of Hazards in Post-1949 Housing
 
 32
 The district court held that the regulations' notice provisions, which prescribe that notice of the hazards of lead paint be given only to tenants and purchasers of housing constructed before 1950, are consistent with the Act. The court found that the Secretary's decision whether to give notice concerning post-1949 housing is unreviewable because it is "committed to agency discretion by law" under 5 U.S.C. Sec. 701(a)(2) (1976). Ashton v. Pierce, 541 F.Supp. at 643. In the court's view, this conclusion follows from the plain language of section 302 of the Act, which provides that notice "may" be given to tenants and purchasers of post-1949 housing "if the Secretary determines, in his discretion, that such housing presents hazards of lead-based paint." 42 U.S.C. Sec. 4822 (1976). In the district court's words, "[t]here is simply no law to apply" in reviewing the Secretary's action, Ashton v. Pierce, 541 F.Supp. at 643; judicial review would impermissibly involve the court in an evaluation of "technical, scientific and financial considerations," id.
 
 
 33
 Appellees respond by noting that while the statutory language grants the Secretary discretion to decide whether to give notice of lead paint hazards in post-1949 housing, it confers that discretion on the Secretary only once he has made the determination of whether hazards exist in post-1949 housing. Appellees read the language "if the Secretary determines, in his discretion, that such housing presents hazards of lead-based paint," 42 U.S.C. Sec. 4822 (1976), as requiring the Secretary at least to determine whether lead-based paint hazards exist in post-1949 housing. Because the administrative record reveals no such determination by the Secretary, appellees assert, the notice regulations are invalid. Moreover, appellees argue, review of the record to ascertain whether the requisite determination has been made is a purely legal inquiry, well within the court's competence.
 
 
 34
 The district court rejected appellees' argument on this point, finding that the regulations' failure to provide for notice of hazards in post-1949 housing demonstrates that the Secretary "has obviously fulfilled any obligation he may have to reach some determination." Id. at 644. The court, relying on Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), refused to "impose a particular decision-making process on an agency where none has been provided by Congress." Id.
 
 
 35
 We agree with the district court's conclusion but not its reasoning. In our view, appellees' argument that section 302 imposes a duty on the Secretary to make a specific finding regarding the hazards present in post-1949 housing was not adequately answered by the court's holding that the regulations themselves are an implicit determination by the Secretary. Indeed, the court noted "[t]he failure of the agency in the course of the administrative proceedings to focus on the notice issue." Id. at 643. We hold that the Secretary's apparent failure to determine whether post-1949 housing presents lead paint hazards does not invalidate the regulations because section 302 imposes no enforceable duty on the Secretary to make such a determination.
 
 
 36
 Appellees argue that we should find such a duty in order to effectuate the remedial purpose of the Act. Brief for Appellees at 50-53. We decline to do so. We may not revise the plain language of the Act merely because we believe our language would better serve the purposes of Congress. Congress knew how to use the word "shall" to impose enforceable duties on the Secretary in section 302. The plain language of section 302 grants the Secretary discretion both to determine the presence or absence of lead paint hazards and to decide whether notice should be given to tenants and purchasers of post-1949 housing. Since the plain language of the statute does not command the Secretary to do either, the Secretary's decisions are "committed to agency discretion by law," 5 U.S.C. Sec. 701(a)(2) (1976), and thus beyond our power to review.
 
 
 37
 D. The Department's Duty to Monitor and Enforce Compliance with the Regulations
 
 
 38
 In addition to challenging the lead-based paint elimination regulations, appellees also sought injunctive relief requiring the Department to monitor and enforce the Authority's compliance with the regulations. Although the district court held that the Annual Contribution Contract between the Department and the Authority provided appellees "a legal basis for seeking injunctive relief" against the Department, Ashton v. Pierce, 541 F.Supp. at 644, the court refused to enjoin the Department, id. at 645. Instead, the court merely ordered the Department on remand to "identify the specific steps it will take to monitor and ensure compliance by local housing authorities with the revised lead-based paint elimination requirements." Id. The Department contends that neither the Act nor the Annual Contribution Contract imposes on the Department an enforceable duty to monitor and enforce compliance with the regulations.
 
 
 39
 We affirm the district court's order. First, we note that the Department has not contended that there is any disputed fact material to this issue, despite its representations that the Department does, in fact, at least monitor the Authority's compliance with the regulations. Reply Brief for Appellants at 4, 13-14. The Department has argued before this court that it has no legal duty to monitor or enforce the Authority's compliance with the regulations, and it has not attempted to defend the sufficiency of whatever monitoring and enforcement activities it currently undertakes. Thus, we are faced solely with the legal question whether the law requires the Department to monitor and enforce the Authority's compliance with the lead-based paint regulations.
 
 
 40
 We are convinced that the Annual Contribution Contract between the Department and the Authority affords appellees a legal basis for enforcing any duties inhering in the Contract. The mutual promises contained in the Contract were intended by the parties to benefit appellees. See 2 S. Williston, A Treatise on the Law of Contracts, Sec. 347 (3d ed. 1959). Indeed, it is difficult to imagine any purpose for the Contract other than to benefit the tenants of public housing. See 42 U.S.C. Sec. 1437c (1976). Thus, appellees are third-party beneficiaries of the Contract and may enforce the duties arising under it. This court has previously recognized that the Contract may be the basis of a suit by tenants to enforce its terms. See Knox Hill Tenant Council v. Washington, 448 F.2d 1045 (D.C.Cir.1971); id. at 1066 (MacKinnon, J., concurring in part, dissenting in part). The Department argues that section 510(B) of the Contract, which provides that "[n]othing in this contract contained shall be construed as creating or justifying any claim against the Government by any third party," undermines appellees' reliance on the Contract. Although the rights of third-party beneficiaries to a contract are derived from, and limited by, the terms of the contract, see Williston, supra, Sec. 364A, we find no evidence that the parties intended section 510(B) to apply to tenants. Assuming that the parties can contract away the third-party beneficiary's right to enforce the contract, the intention to do so must be more clearly expressed than it is in section 510(B). Thus, appellees have the right to compel the Department to perform its duties under the Contract.
 
 
 41
 It is clear that Congress intended the Department to monitor and enforce the Authority's compliance with regulations promulgated under section 302 of the Act. Section 302 commands the Secretary to establish lead-based paint regulations with respect to "any existing housing ... which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary." 42 U.S.C. Sec. 4822 (1976) (emphasis added). This language is very broad, encompassing all housing in every Department program that provides "mortgage insurance" or "housing assistance." Certainly, the Annual Contribution Contract under which the Authority receives funds from the Department, authorized by 42 U.S.C. Sec. 1437c (1976), is "a program administered by the Secretary." By its very words, therefore, the statute requires that the Secretary "establish procedures" with respect to housing operated by the Authority.
 
 
 42
 The Department argues, however, that it is not required to monitor or enforce the Authority's compliance with the procedures it establishes because section 302 orders it to "implement" the procedures only with respect to "all federally owned properties." Id. Sec. 4822 (emphasis added). We reject this argument. The Department errs in equating "implement" with "monitor and enforce." Congress obviously envisioned that the Department itself would be responsible for actually carrying out the lead paint elimination procedures for housing owned by the federal government. This does not mean, however, that the Department has no responsibility at all in regard to the other types of housing covered by the Act.
 
 
 43
 Indeed, in our view, finding that section 302 creates a duty to monitor and enforce compliance with the regulations is the only sensible interpretation of that section. It would be unusual for Congress to command the Department to establish procedures requiring extensive study and the application of the agency's expertise if those procedures were to be merely advisory with respect to all but the relatively small class of housing actually owned by the federal government. Congress was intensely concerned with the public health menace of lead poisoning and clearly intended to bring the power of the federal government to bear in ameliorating the problem. Congress intended that the lead paint elimination procedures established by regulation must be applied as a condition of obtaining federal mortgage insurance on a private dwelling. See 118 Cong.Rec. 20,853 (1972) (remarks of Sen. Schweiker). Thus, by fair implication, compliance with the lead-based paint elimination requirements is a necessary component of the Authority's duties under sections 201 and 209 of the Contract, respectively, to provide "decent, safe, and sanitary dwellings" and to "maintain each Project in good repair, order, and condition."
 
 III. CONCLUSION
 
 44
 For the foregoing reasons, the order of the district court is
 
 
 45
 Affirmed.
 
 
 
 *
 See 723 F.2d 70