Harold and Evangeline HURT, et al.,

v.

PHILADELPHIA HOUSING
AUTHORITY, et al.

Civ. A. No. 91–4746.

United States District Court,
E.D. Pennsylvania.

Aug. 27, 1992.

**518**

Herbert Monheit, Maryann Monheit, Law Offices of Herbert Monheit, Philadelphia, Pa., Kenneth F. McCallion, Bernard Persky, James W. Johnson, Arthur M. Neiss, Goodkind, Labaton & Rudoff, New York City, for Harold Hurt, Evangeline Hurt, Tanya Parker and Veronica Cooper.

Denise J. Baker, Roxanne D. Galeota, Philadelphia Housing Authority, Lois W. Davis, Asst. U.S. Atty., Alan C. Kessler, Buchanan Ingersoll Professional Corp., Philadelphia, Pa., Elaine Romberg, Felix Baxter, Dept. of Justice, Civ. Div., Washington, D.C., for Philadelphia Housing Authority.

Lois W. Davis, Asst. U.S. Atty., Elaine Romberg, Felix Baxter, Dept. of Justice, Civ. Div., Washington, D.C., for Jack Kemp, U.S. Dept. of Housing and Urban Development and U.S.

Patrick K. O'Neill, Philadelphia Solicitor's Office, John B. Day, Thomas J. Wamser, Deputy City Sol., Michael Mathers, City of Philadelphia, Law Dept., R. Matthew Pettigrew, Jr., Asst. City Sol., Philadelphia, Pa., for City of Philadelphia.

Joseph B.G. Fay, Thomas M. Kittredge, Morgan Lewis & Bockius, James D. Pagliaro, Philadelphia, Pa., Mary Morrissey Sullivan, Mark L. Sullivan, Sullivan, Sullivan, & Pinta, Boston, Mass., for Lead Industries Ass'n, Inc.

Jonathan F. Bloom, Bennett G. Picker, Bolger, Picker, Hankin & Tannenbaum, Philadelphia, Pa., Donald E. Scott, Timothy S. Hardy, John S. Walker, Kirkland & Ellis, Washington, D.C., for NL Industries, Inc.

Robert C. Heim, Mary A. McLaughlin, Abigail R. Simkus, Dechert, Price & Rhoads, Philadelphia, Pa., Otis Pratt Pearsall, Philip H. Curtis, William H. Voth, Arnold & Porter, New York City, Murray Garnick, Lawrence V. Stein, Arnold & Porter, Washington, D.C., for Atlantic Richfield Co.

John P. Penders, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, Pa., Charles H. Moellenberg, Jr., Alan D. Chute, Jones, Day, Reavis & Payne, Pittsburgh, Pa., for Sherwin–Williams Co.

Michael K. Sullivan, Drinker, Biddle & Reath, Philadelphia, Pa., G. Marc Whitehead, Michael T. Nilan, Scott A. Smith, Minneapolis, Minn., for SCM Corp. and Glidden Co.

Andre L. Dennis, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., Charles W. Siragusa, Wade R. Joyner, Crowley, Barrett & Karaba, Ltd., Chicago, Ill., for Fuller–O'Brien Corp.

Mark Lynch, Norman L. Haase, Emily Morris Salmons, Dunn, Haase, Sullivan, Mallon, Cherner & Broadt, Media, Pa., for St. Joe Minerals Corp.

James D. Shomper, Jr., Gary N. Brown, Dupont Co., Wilmington, Del., for E.I. Dupont De Nemours & Co.

Thomas A. Kuzmick, Rawle & Henderson, Philadelphia, Pa., for Carboline Co.

Paul F. Lantieri, Bennett, Bricklin & Saltzburg, Philadelphia, Pa., Lawrence J. Gornick, James L. Miller, William A. Levin, Amy J. Levin, Brobeck, Phleger & Harrison, San Francisco, Cal., for Devoe Coating Co.

Natalie Tull Greene, Thomas P. Grace, LaBrum and Doak, Philadelphia, Pa., Glenn M. Cooper, Ronald Dweck, Paley, Rothman, Goldstein, Rosenberg and Cooper, Bethesda, Md., for Duron, Inc.

Michael J. Sweeney, James R. Miller, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for Pratt & Lambert, Inc.

Mitchell S. Pinsly, Philadelphia, Pa., for Rust–Oleum Corp. and XIM Products, Inc.

Linda T. Jacobs, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Ameron, Inc.

Joanne R. Jenkins, Thompson & Pennell, Joseph R. Thompson, Philadelphia, Pa., for The Valspar Corp.

William J. O'Brien, Conrad, O'Brien, Gellman, De Stefano & Rohn, Philadelphia, Pa., for Courtalds Coatings, Inc.

Thomas B. York, Dept. of Public Welfare, Harrisburg, Pa., for Regina Dunkinson, and Bureau of Hosp. and Outpatient Programs.

## MEMORANDUM

GILES, District Judge.

Plaintiffs are past and/or present residents of housing units owned and/or managed by the Philadelphia Housing Authority ("PHA"). Plaintiffs have filed a class action suit against PHA, other local, state, and federal government instrumentalities and officials, lead-pigment manufacturers, and those manufacturers' trade association. Plaintiffs advance a plethora of claims against defendants based upon injuries allegedly sustained as a result of exposure to lead-based paint applied to their PHA housing units.[1] Plaintiffs seek both compensatory and injunctive relief. All remaining defendants[2] except for Pennsylvania Department of Health ("DOH") and Regina Dunkinson ("Dunkinson"), the Director of DOH, have filed motions to dismiss.

## I. ALLEGATIONS OF THE AMENDED COMPLAINT

### a. *Plaintiffs' injuries*

Plaintiffs' Amended Complaint is grounded upon the foundational allegation that "[l]ead is a toxic substance with serious adverse affects [sic] on human beings" and "is particularly hazardous to young children under the age of six...." Amended Complaint at ¶ 50. In support of their allegations plaintiffs cite a summary statement of the Consumer Product Safety Commission, 16 C.F.R. § 1303.5. Amended Complaint at ¶ 55. The Safety Commission notes that "there are three stages to childhood lead poisoning." *Id.* While "[t]he adverse health effects in the first stage are not clinically present," the second stage generates "such symptoms as loss of appetite, vomiting, apathy, drowsiness, and inability to coordinate voluntary muscle movements" and after-effects which "include seizure disorders as well as various behavioral and functional disorders often included under the heading of minimal brain dysfunction." *Id.* Finally, "[t]he adverse health effects of the third stage may be permanent and can include blindness, mental retardation, behavior disorders, and death." *Id.*

Plaintiffs allege that "[t]he greatest danger of lead poisoning for City children is posed by the ingestion of peeling or flaking lead paint which has been applied to buildings where they reside or spend significant amounts of time." Amended Complaint at ¶ 54. According to plaintiffs, "[s]uch poisoning also results from breathing crumbling and oxidizing lead paint that had been applied to buildings where City children reside or spend significant amounts of time." *Id.* Plaintiffs and other class members[3] are suing on behalf of themselves and their children, alleging that they have incurred the above-described injuries because, "[f]rom the date of the inception of plaintiffs' and other Class members' residency in [PHA] premises to the present, the minor plaintiffs and other minor Class members have been exposed numerous times to the hazards of lead, and to this day continue to be exposed to lead directly

---

1. References to PHA units include those owned and/or managed by PHA during the relevant time period.

2. Several of the corporate defendants have been voluntarily dismissed, namely, Duron, Inc., Rust–Oleum Corporation, Ameron, Inc., and Courtalds Coatings, Inc. In addition, corporate defendants Eagle–Pitcher Industries, Inc., Carboline Company, and Mobile Paint Manufacturing Company, Inc., were named in the Original Complaint, filed on July 25, 1991, but were not named in the Amended Complaint, filed on October 22, 1991.

3. The class has not yet been certified, but, to simplify, this memorandum will include references to the entire class.

and/or indirectly from the interior and/or exterior surfaces of the premises." Amended Complaint at ¶ 89.

### b. *Federal statutory claims*

Eight of the first ten counts of the Amended Complaint (Counts I–II and V–VIII) allege violations of federal statutes by City and Federal Defendants.[4] Counts I–II and V–VIII allege violations of 42 U.S.C. § 1983 ("§ 1983").[5] In Count I plaintiffs allege the deprivation of their rights "to property, due process of law and equal protection under the law," Amended Complaint at ¶ 101, because the named defendants "have adopted and are presently pursuing a policy, practice, custom and usage of depriving and continuing to deprive, plaintiffs of the right to decent, safe and sanitary housing by allowing in the past, and continuing to allow, the presence of lead-based paint in the HUD-assisted housing in the City of Philadelphia." Amended Complaint at ¶ 99. Plaintiffs assert Count I against City and Federal Defendants and seek substantial compensatory damages. Amended Complaint at ¶ 102.

In Count II plaintiffs seek injunctive relief against City and Federal Defendants based upon the same allegations set forth in Count I. Specifically, plaintiffs ask that this court require defendants to inspect PHA units for lead-based paint, abate where necessary, educate PHA residents as to the ill effects of lead-based paint, diagnose residents for potential lead-exposure health problems, and treat residents for these health problems.

Counts V–VIII also allege violations of § 1983, not because plaintiffs have been deprived of constitutional rights, as in Counts I–II, but because they were and are being deprived of independent federal statutory rights. In Count V and VI plaintiffs allege that City and Federal Defendants have failed to provide safe, sanitary, and affordable housing and have thereby deprived them of their rights under the United States Housing Act of 1937 ("USHA"), 42 U.S.C. §§ 1437 *et seq.* ("§§ 1437 *et seq.*"). The stated goal of the USHA, as set forth in § 1437, is to "remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." HUD tries to achieve this goal primarily through the provision of financial support to local public housing authorities, who are then given responsibility to administer public housing programs. Based on alleged violations of §§ 1437 *et seq.* and its implementing regulations, plaintiffs seek compensatory damages (Count V) and injunctive relief (Count VI).[6]

In Counts VII–VIII plaintiffs press further claims under § 1983 by alleging that City and Federal Defendants have deprived plaintiffs of rights which they hold under the Lead–Based Paint Poisoning Prevention Act ("LPPPA"), 42 U.S.C. §§ 4821–4846. Congress passed the LPPPA in 1971 in an effort to combat the presence of lead-based paint in housing connected with HUD-assisted programs. § 4822. Plaintiffs allege that the past and continuing presence of such paint in their residences violates the provisions of, and their rights under, the LPPPA. Again, plaintiffs sue for compensatory damages (Count VII) and injunctive relief (Count VIII).

Counts IX–XI also allege violations of federal statutes, but are not brought under § 1983. Rather, plaintiffs argue that they

---

4. Federal Defendants include the United States of America ("United States") and the United States Department of Housing and Urban Development ("HUD"), as well as Jack Kemp ("Kemp"), the Secretary of HUD, for those counts in which injunctive relief is sought. City Defendants include PHA and the City of Philadelphia ("City").

5. 42 U.S.C. § 1983 provides in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected to, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

6. References to "injunctive relief" include that relief which is specified *supra* in connection with Count II of the Amended Complaint.

have direct, private rights of action to enforce the USHA, the LPPPA, and the Early and Periodic Screening, Diagnosis and Treatment Program ("EPSDT"), 42 U.S.C. § 1396d(a)(4)(B), a Medicaid program intended to provide early medical intervention services for eligible children. In Counts IX–XI plaintiffs seek injunctive relief to enforce the provisions of the USHA, the LPPPA, and the EPSDT, respectively. Counts IX and X are lodged against City Defendants. Count XI names defendants DOH and Dunkinson, since it is DOH which administers the EPSDT, along with other specified medical programs, in return for federal Medicaid funds.[7]

### c. *Contract claims*

Plaintiffs allege three contract claims against HUD and/or PHA. In Count XII plaintiffs allege that PHA has breached its Annual Contribution Contract ("ACC") with HUD and sues on that contract as a third-party beneficiary. The ACC is the contract in which a local housing authority pledges to undertake certain responsibilities in exchange for HUD funding. Those responsibilities include the provision of "decent, safe, and sanitary dwellings within the financial reach of families who are in the lowest income groups." Amended Complaint at ¶ 159 (citing HUD's Consolidated Annual Contributions Contract Between Local Authority and the United States of America at Part One § 5 (1969)). Plaintiffs claim that PHA has breached the ACC by forcing its residents to endure lead-based paint exposure, and that, as intended beneficiaries of the ACC, they are entitled to sue PHA on that contract.

In Counts XV and XVI plaintiffs sue HUD and PHA, construing these defendants as their joint landlord. Based upon injuries allegedly stemming from exposure to lead-based paint, plaintiffs sue HUD and PHA for breach of the implied covenant of quiet enjoyment (Count XV) and breach of the implied warranty of habitability (Count XVI).

### d. *Other claims against City Defendants*

Two further counts of the Amended Complaint are lodged against City Defendants. In Count XIII plaintiffs claim that PHA has violated Philadelphia Code §§ 603 and 7205 by allowing lead-based paint to be applied and to remain on the surfaces of PHA housing units. In Count XIV plaintiffs allege negligence against both City Defendants for their use of lead-based paint and for their failure to remove it and to take other steps to alleviate its injurious effects.

### e. *Claims against Corporate Defendants*

Twelve of the Amended Complaint's twenty-six counts are pled exclusively against Corporate Defendants, including various manufacturers and sellers of lead pigment and/or lead-based paint products, or successors-in-interest to such manufacturers and sellers.[8] These defendants are: NL Industries, Inc. ("NLI"), Atlantic Richfield Company ("ARCO"), Sherwin–Williams Company ("Sherwin–Williams"), SCM Corporation ("SCM"), Glidden Company ("Glidden"), Fuller–O'Brien Corporation ("Fuller–O'Brien"), St. Joe Minerals Corporation ("St. Joe"), E.I. Dupont De Nemours & Co. ("Dupont"), Devoe Coatings Company ("Devoe"), Pratt & Lambert, Inc. ("Pratt & Lambert"), XIM Products, Inc. ("XIM"), and The Valspar Corporation ("Valspar").[9] One further Corporate Defendant is the Lead Industries Association, Inc. ("LIA"), an incorporated trade association to which the above-named companies belonged during the relevant time period.

Of the above-named defendants, plaintiffs allege that NLI, ARCO, Sherwin–Williams, SCM, Glidden, Dupont and St. Joe manufactured and/or marketed lead pigment products. Amended Complaint at

---

7. DOH and Dunkinson will be referred to collectively as "Commonwealth Defendants".

8. To simplify, further references to the manufacturers of lead pigments or lead-based paint

will incorporate references to their successors-in-interest.

9. *See supra* note 2.

¶ 37. Hence, these defendants will be referred to collectively as "Lead Pigment Defendants". Defendants Sherwin–Williams, SCM, Glidden, Dupont, Devoe, Pratt & Lambert, XIM, Fuller–O'Brien, and Valspar are alleged to have manufactured and/or marketed lead-based paint products, of which lead pigments are but one component. Amended Complaint at ¶ 38. These defendants will be referenced collectively as "Lead-based Paint Defendants".

The foundational allegations against Corporate Defendants are found in ¶¶ 56–72 of the Amended Complaint. In a nutshell, plaintiffs allege that from the 1920's to the 1950's Corporate Defendants became increasingly aware of the hazards of lead-based paint but nonetheless waged an aggressive promotional campaign to persuade the public that their products were safe in order to market them as effectively as possible. A large part of this promotional campaign took place through LIA-sponsored research intended to discredit the prevailing view in the scientific community that lead-based paint posed a health hazard. Plaintiffs advance a number of legal theories why, under such facts, Corporate Defendants should be held liable for injuries incurred as residents of PHA housing, where lead-based paint was applied and has remained for decades.

Counts III–IV allege violations of 42 U.S.C. § 1985 ("§ 1985").[10] Specifically, plaintiffs allege that Corporate Defendants "conspired with the governments and public agencies named as defendants herein to, and did, violate plaintiffs' statutory right to decent, safe, and sanitary housing, thereby depriving plaintiffs of their constitutional rights to due process of law and equal protection under the law...." Amended

Complaint at ¶ 108. As compensation for these violations of law, plaintiffs seek damages (Count III) and injunctive relief (Count IV).

In Counts XVII–XXVI plaintiffs lodge ten claims against Corporate Defendants. Count XIX alleges a contract claim based upon express and implied warranties that the lead-based paint products sold by Corporate Defendants and applied to PHA housing were of good and merchantable quality and fit for their intended purpose. Plaintiffs allege breach of warranty in that the lead-based paint products were not of such marketable quality.

Five of the remaining nine counts lodged against Corporate Defendants allege tortious conduct giving rise to individual liability: negligent product design (Count XVII), negligent failure to warn (Count XVIII), strict products liability (Count XX), fraud and misrepresentation (Count XXI), and intentional tort (Count XXII). The remaining four counts allege theories of joint liability: civil conspiracy (Count XXIII), concert of action (Count XXIV), enterprise liability (Count XXV), and market share liability (Count XXVI). These last four counts allege theories of liability based upon which Corporate Defendants can be held jointly and severally liable for tortious conduct of the type alleged in Counts XVII–XVIII and XX–XXII.

The court will now consider the motions to dismiss by examining each count of the Amended Complaint as categorized *supra.*

## II. FEDERAL STATUTORY CLAIMS

a. *Counts I–II: § 1983/deprivation of constitutional rights*

■ City and Federal Defendants move for dismissal of Counts I and II, arguing

---

**10.** 42 U.S.C. § 1985(3) provides:

It two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State of Territory from giving or securing to all persons within such State or Territory the equal protection

of the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

that there is no constitutional right "to decent, safe and sanitary housing" as claimed by plaintiffs. Amended Complaint at ¶ 99. Defendants rely upon *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), in which the Supreme Court stated:

> We do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality.... Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial functions....

*Id.* at 74, 92 S.Ct. at 874.

Plaintiffs counter that they are not asserting a constitutional right to decent housing, but rather are alleging the "taking of a protected liberty interest in bodily security and a possible taking of life-interests protected by the due process clause of the Fourteenth Amendment." Opposition to City Defendants' Motion to Dismiss at 10. Initially, it is noted that deprivation of "the right to decent, safe and sanitary housing" is *precisely* what plaintiffs allege in Counts I and II, and not the liberty interest upon which they focus in their response to the motion to dismiss. Amended Complaint at ¶¶ 99, 103.

Nevertheless, plaintiffs' effort to re-formulate the nature of the constitutional claim alleged in Counts I and II is unsuccessful. Plaintiffs argue that because they live in PHA housing PHA has a constitutional duty to provide for plaintiffs' safety and well-being. The United States Supreme Court has recently made clear, however, that the affirmative duty of care mandated by the fourteenth amendment's due process clause arises in only the narrowest of contexts, namely, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself...." *DeShaney v. Winnebago County Depart-*

*ment of Social Services,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Court held that defendant social services agency was not liable for the injuries inflicted on a child by his abusive father, even though the agency knew of the child's dangerous situation and had taken certain preventive measure short of termination of custody.

Here, PHA provided plaintiffs with housing, but they were not forced to accept it, as in the case of a prisoner or institutionalized mental patient. *DeShaney,* 489 U.S. at 199, 109 S.Ct. at 1005. Thus, plaintiffs were not restrained to the degree required by *DeShaney* to trigger an affirmative constitutional duty of care. *See also Crosby v. Luzerne County Housing Authority,* 739 F.Supp. 951 (M.D.Pa.1990) (housing authority not liable for death of man killed when Section 8 housing caught fire due to Fire Code violations of which defendant was aware). Accordingly, Counts I and II are dismissed as to all defendants.

b. *Counts V–VIII: § 1983/deprivation of rights under the USHA and LPPPA*

In Counts V–VIII plaintiffs sue City and Federal Defendants under § 1983 based upon the alleged deprivation of their rights under the USHA and LPPPA. First, the court considers Federal Defendants' arguments for dismissal. They argue that, unlike state and local governments and officials, they are not subject to suit under § 1983 for violations of the USHA.

By its own terms, § 1983 provides a cause of action against any person who acts under color of *state,* and not *federal,* law to deprive another of his constitutional or federal statutory rights.[11] *See District of Columbia v. Carter,* 409 U.S. 418, 429–30, 93 S.Ct. 602, 608–09, 34 L.Ed.2d 613 (1973) (explaining rationale for Congress' decision not to pass legislation similar to § 1983 and applicable to federal officials). Plaintiffs concede that federal officials cannot normally be held liable under § 1983. They argue, however, that there is one

---

11. *See supra* note 5.

exception, namely, where federal officials are charged with conspiring with state officers and employees to effect a deprivation of an individual's federal rights. In support of this argument plaintiffs cite *Martinez v. Winner*, 771 F.2d 424, 441 (10th Cir.), *mod. on other grounds*, 778 F.2d 553 (10th Cir.1985), *vacated on other grounds*, 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 333 (1986). As stated in *Martinez*, 771 F.2d at 441, "[f]ederal officials ordinarily are not suable under § 1983, which requires action under color of state law, but they may be liable under § 1983 where, as here, they are charged with conspiring with state officers or employees."

■ In response, Federal Defendants point out, and plaintiffs do not contest, that § 1983 creates a cause of action against *persons* who act under color of state law in depriving citizens of their protected rights. Thus, regardless of the implications of *Martinez*, plaintiffs cannot sue the United States or HUD under § 1983. Counts V–VIII must be dismissed as to these defendants.[12]

■ As for defendant Kemp, he is theoretically suable under § 1983, but only if he is charged with conspiring personally with state and/or local officials to deprive plaintiffs of their rights under the USHA or LPPPA. To plead adequately, however, plaintiffs cannot simply make general, conclusory allegations of conspiracy. Rather, they must plead specific acts taken by defendant Kemp together with state and/or local officials toward some unlawful end. *Melo v. Hafer*, 912 F.2d 628, 638 (3d Cir. 1990). Here, however, no such allegations are advanced in the Amended Complaint, nor even in plaintiffs' response to the Federal Defendants' motion to dismiss. Thus, defendant Kemp is not subject to liability under § 1983, and Counts VI and VIII must be dismissed against him.[13]

Counts V–VIII also name City Defendants. Unlike Federal Defendants, the City and PHA do act under color of state

law and under certain circumstances may be reached under § 1983.

In *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Court ruled that plaintiffs could sue a defendant housing authority under § 1983 to enforce their rights under the Brooke Amendment, a specific provision of the USHA which sets an income-based rent ceiling for public housing units. 42 U.S.C. § 1437a. The Court ruled that the Brooke Amendment satisfied the two-step test for bringing a § 1983 claim: (1) Congress had not foreclosed the filing of a private cause of action, and (2) plaintiffs were seeking to enforce specific, tangible rights. *Id.* at 423, 107 S.Ct. at 770. After concluding that nothing in the USHA precluded plaintiffs from bringing a private action, the Court went on to conclude, in regard to the *Wright* test's second prong, that:

> the benefits that Congress intended to convey on tenants [through the Brooke Amendment] are sufficiently specific and definite to qualify as enforceable rights under [*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.

*Wright*, 479 U.S. at 432, 107 S.Ct. at 774–75.

By implication, the Court distinguished the Brooke Amendment from broad policy provisions which do not create specific rights and are not realistically enforceable by the courts. One such provision is 42 U.S.C. § 1437, in which Congress states that the goal of the USHA is to "remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." A § 1983 claim based on this provision was dismissed in *Perry v. Housing Authority of City of Charleston*,

---

**12.** The same holds true for Counts I and II, discussed and dismissed on a separate basis *supra*, and Counts VII and VIII, discussed *infra*.

**13.** Indeed, nowhere in the Amended Complaint do plaintiffs allege specific conspiratorial acts against Kemp. This is another basis for dismissing Count II against him.

664 F.2d 1210 (4th Cir.1981), for the same reason expressed in *Wright*, namely, that the plaintiffs therein did not point "to any substantive provisions of the various housing acts which give them a tangible right, privilege or immunity" within the competence of the judiciary to enforce. *Perry*, 664 F.2d at 1217.

■ City Defendants move to dismiss Counts V–VIII on the ground that, as in *Perry*, plaintiffs have done no more than plead the language of § 1437's general policy provision, thereby running afoul of the *Wright* standard's second prong. Plaintiffs have invoked language reminiscent of § 1437 in the body of the Amended Complaint, at ¶ 77, and Count V refers only to the "USHA and its implementing regulations concerning decent, safe, and sanitary housing." Amended Complaint at ¶ 115. If these were the only allegations made by plaintiffs, then City Defendants would prevail by reason of the second half of the *Wright* analysis.

Plaintiffs have, however, done more. In the body of the Amended Complaint, subsequently incorporated into Counts V–VIII, they have cited to various regulatory provisions which they seek to enforce, including:

HUD procedures for the notification, inspection, and elimination of lead-based paint hazards generally ... found at 24 C.F.R. § 35, Subparts A and C, and the procedures for the inspection and elimination of lead-based paint in housing financially assisted by the program under Section 8 of the United States Housing Act ... found at 24 C.F.R. § 882.109(i).

Amended Complaint at ¶ 76. Plaintiffs refer here to 24 C.F.R. § 35 ("Part 35"), which was issued in response to the LPPPA and more specifically. directs HUD

officials to carry out the lead-poisoning prevention measures envisioned by that Act.

Subpart C of Part 35 is entitled "Elimination of Lead–Based Paint Hazards in HUD–Associated Housing." Section 35.24 of this Part is entitled "Requirements" and concludes with § 35.24(4):

Any requirements of this section shall be deemed superseded by a regulation by an Assistant Secretary with respect to any program under his or her jurisdiction which states expressly that it is promulgated under the authorization granted in this section and supersedes, with respect to programs within its defined scope, the requirements prescribed by this section. *See, e.g.*, 24 CFR ... § 882.109(i) (Section 8 Existing Housing); part 965, subpart H (Public Housing)....

Pursuant to, this subsection, § 882.109(i) and part 965, subpart H (§§ 965.701–965.711), are incorporated into Part 35 (and thus become part of the LPPPA's implementing regulations). At the same time, § 882.109(i) and §§ 965.701–965.711 are incorporated into those segments of the Code of Federal Regulations issued pursuant to the USHA. Parts 882 and 965. Thus, the USHA and the LPPPA provide a dual source of authority for the issuance of these regulations, which serve to implement both statutes.

These regulations require local housing authorities which receive funds from HUD to inspect the units under their management for lead-based paint and to cover or remove such paint where found. Unlike the general policy provision of § 1437, such anti-lead-poisoning measures are specific, affirmative obligations akin to the rent ceiling provision at issue in *Wright*. Because they do not suffer from the general policy language vagueness of § 1437, these regulatory provisions [14] create rights in plain-

---

**14.** It does not matter that the obligations at issue are created by regulation rather than by statute. In *Holly v. Housing Authority of New Orleans*, 684 F.Supp. 1363 (E.D.La.1988), the court noted that "*Wright* involved a claim that a local public housing agency had violated both the Brooke Amendment to the Housing Act *and* its implementing regulations." *Id.* at 1366 n. 8 (emphasis added). The *Wright* Court specifical-

ly included regulations within the scope of rights enforceable under § 1983, 479 U.S. at 431, 107 S.Ct. at 774, and cited favorably to *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), wherein the Court had stated that "[i]t has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'" *Id.* at 295, 99 S.Ct. at 1714.

tiffs enforceable under § 1983.[15]

Other courts considering public housing tenants' rights under the LPPPA have concluded that they may sue to enforce its provisions.[16] One of those courts did rule that a plaintiff seeking to enforce the LPPPA is entitled only to injunctive relief, and not to monetary damages. *Roseberry v. United States*, 736 F.Supp. 408 (D.N.H. 1990). According to the reasoning of that court, Counts V and VII of the Amended Complaint, in which plaintiffs seek an award of monetary damages, should be dismissed.

■ However, this court is not persuaded by the reasoning of the *Roseberry* court. None of the cases relied upon by that court in making its ruling actually reached the conclusion that monetary relief is unavailable in an action to enforce the LPPPA. Although the *Roseberry* court faced the question squarely, there is no independent support for its ruling. In *Wright*, the Supreme Court made no distinction between injunctive and monetary relief, but merely set forth the standard for determining whether a private right of action exists under § 1983. Once it is determined that there exists a private right of action to enforce the LPPPA, there is no ground for distinguishing it from any other § 1983 action, where both injunctive and monetary relief are available. Therefore, plaintiffs may proceed against PHA as to Counts V and VI.

■ However, plaintiffs' asserted rights are not enforceable against the City. Only local housing authorities are endowed with the authority and the responsibility to take anti-lead-poisoning measures under the

USHA/LPPPA and their joint regulations. There are no allegations in the Amended Complaint which would implicate the City in PHA's alleged failure to fulfill its duties under these statutes. Counts V–VIII are dismissed as to the City.

c. *Counts IX–XI: private rights of action for direct enforcement of the USHA, LPPPA, and EPSDT*

■ As discussed *supra*, in the context of Count V, plaintiffs may sue under § 1983 to enforce specific, substantive provisions of the USHA and its implementing regulations such as 24 C.F.R. § 882.109(i). Essential to the holding in *Wright* is the Supreme Court's ruling that public housing tenants have direct, enforceable rights under the USHA (and thereby satisfy the second half of the *Wright* standard). Thus, they may also sue to enforce the statute directly, as plaintiffs have done in Count IX of the Amended Complaint. As discussed *supra*, however, there is no ground for suing the City under the USHA. Thus, Counts IX must be dismissed as to the City, but not as to PHA.[17]

The same is true of Count X. Plaintiffs may sue PHA directly or indirectly (under § 1983) to enforce specific, substantive provisions of the LPPPA and its implementing regulations.[18] However, Count X must be dismissed as to the City, which does not owe plaintiffs any obligation under the LPPPA or its accompanying regulations.

Through Count XI, which is asserted solely against Commonwealth Defendants, plaintiffs seek to enforce the EPSDT. Commonwealth Defendants have not filed a motion to dismiss this count.

---

**15.** City Defendants' challenge to Counts V–VIII do not focus on the first half of the *Wright* standard. As with the Brooke Amendment, there is no evidence that Congress intended to foreclose a private right of action to enforce these implementing regulations of the LPPPA/ USHA by, for example, supplanting a prospective § 1983 remedy with an alternative administrative scheme of enforcement. *Wright*, 479 U.S. at 427–28, 107 S.Ct. at 772–73. Moreover, while the LPPPA merely directs HUD to implement anti-lead-poisoning measures, the measures implemented as a result are (unless illegal-

ly issued) equally expressive of congressional intent.

**16.** *Roseberry v. United States*, 736 F.Supp. 408 (D.N.H.1990); *Ashton v. Pierce*, 541 F.Supp. 635 (D.D.C.1982); *aff'd*, 716 F.2d 56 (D.C.Cir.1983); *New York City Coalition to End Lead Poisoning v. Koch*, 138 Misc.2d 188, 524 N.Y.S.2d 314 (N.Y.Sup.Ct.1987).

**17.** These are the only two defendants named in Counts IX and X.

**18.** *See supra* note 16.

## III. CONTRACT CLAIMS

### a. *Count XII: third-party beneficiary action to enforce the ACC*

■ In Count XII plaintiffs sue PHA in their capacity as third-party beneficiaries to the ACC, the contract between HUD and PHA wherein HUD provides annual financial contributions to PHA and PHA pledges to comply with the USHA and with HUD regulations in the provision of low-income housing. 42 U.S.C. § 1437c. Plaintiffs allege that PHA has breached this contract by virtue of the lead-based paint applied to and left on the surfaces of its housing units. They argue that they are intended beneficiaries of the ACC and are therefore entitled to sue to enforce it.

The case law supports plaintiffs' contention. For example, in *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir.1981), the Seventh Circuit ruled that public housing tenants were the intended beneficiaries of the ACC and could therefore sue Section 8 landlords to enforce its terms. In *Ashton v. Pierce*, 716 F.2d 56 (D.C.Cir.1983), the court likewise ruled that "the Annual Contribution Contract between the Department and the Authority affords appellees a legal basis for enforcing *any duties inhering in the Contract.*" *Id.* at 66 (emphasis added).[19] In *Howard v. Pierce*, 738 F.2d 722 (6th Cir. 1984), the Sixth Circuit ruled that plaintiffs' were intended beneficiaries of the Brooke Amendment and were entitled to enforce that particular obligation as incorporated into the ACC.

As PHA notes, the *Howard* court did affirm the ruling in *Perry v. Housing Authority of City of Charleston*, 664 F.2d 1210 (4th Cir.1981), that tenants were not intended beneficiaries as to § 1437 (the general policy provision) of the USHA. *Howard*, 738 F.2d at 727 n. 9. In so ruling,

the *Howard* court made the same distinction, discussed *supra* in comparing *Perry* and *Wright*, between general policy language, which is merely precatory, and specific, substantive statutes and regulations, which create tangible, enforceable rights. Here, where PHA is specifically required to test for and abate lead-based paint, *Perry* is again inapposite. The anti-lead-poisoning obligations imposed upon PHA by the LPPPA/USHA form part and parcel of the ACC, *see* 24 C.F.R. § 965.711, and public housing tenants are the intended beneficiaries of those obligations. Therefore, plaintiffs may proceed under Count XII.

### b. *Counts XV and XVI: breach of the implied covenant of quiet enjoyment and the implied warranty of habitability*

■ Plaintiffs have sued HUD and PHA for breach of the implied covenant of quiet enjoyment and the implied warranty of habitability. Each of these counts fails to state a proper claim because public housing leases do not give rise to implied covenants or warranties. *Alexander v. U.S. Department of Housing and Urban Development*, 555 F.2d 166 (7th Cir.1977) (no implied warranty of habitability); *Gibson v. Gary Housing Authority*, 754 F.2d 205 (7th Cir.1985) (no implied covenant of quiet enjoyment). Plaintiffs attempt to rely upon their third-party beneficiary rights under the ACC, as discussed *supra*, but they offer no support for the argument that rights to enforce the ACC give rise to further rights under implied covenants or warranties.[20] In light of *Alexander* and *Gibson*, Counts XV and XVI must be dismissed.[21]

---

**19.** PHA stresses that despite this language the *Ashton* court ruled only that tenants could sue to enforce HUD's duties under the ACC. This was true under the circumstances of that case, wherein plaintiffs were challenging the regulations issued by HUD as legally inadequate. However, the language quoted from *Ashton* implies that tenants can also sue the other party to the ACC, namely, their local housing authority.

**20.** Again, the underlying principle is that the more specific language of the LPPPA/USHA creates enforceable rights, but not the general policy language of § 1437, from which plaintiffs in *Alexander* and *Gibson* tried to derive implied covenants and warranties.

**21.** It is only HUD which argues for dismissal based upon *Alexander* and *Gibson*, but these decisions mandate dismissal against PHA as well.

## IV. OTHER CLAIMS AGAINST CITY DEFENDANTS

### a. Count XIII: violation of city housing and health codes

In Count XIII plaintiffs sue PHA for violations of the city housing and health code. As PHA notes, however, enforcement authority is vested exclusively with the City. 351 Pa.Code §§ 1.1–100 and 1.1–102. While PHA is required to abide by the local housing code, plaintiffs have offered no support for the proposition that *they* have a right to enforce the code against PHA. Count XIII is accordingly dismissed.

### b. Count XIV: negligence in use and non-removal of lead-based paint

In Count XIV plaintiffs allege negligence against both PHA and the City for their use of lead-based paint and for their failure to remove such paint and to take other steps to alleviate its injurious effects on plaintiffs.[22] While PHA does not seek the dismissal of Count XIV *per se*, it has moved for the dismissal of all counts lodged against it on the grounds of sovereign immunity and lack of statutory notice.[23]

PHA argues that, as an agency of the Commonwealth, it is immune from suit under the eleventh amendment.[24] However, a public agency does not qualify for eleventh amendment immunity based solely on the statutory designation. Rather, as set forth in *Fitchik v. New Jersey Transit Rail Operators, Inc.*, 873 F.2d 655 (3d Cir.1989), a court must consider three factors in determining whether a public agency is entitled to eleventh amendment immunity:

(1) Whether the money that would pay the judgment would come from the state . . .

(2) The status of the agency under state law . . . and

(3) What degree of autonomy the agency has.

*Id.* at 659.

Application of the *Fitchik* test leads to the conclusion that PHA is not protected from suit by the eleventh amendment. In *Artwell v. Chester Housing Authority*, Civil Action No. 91–1997, 1991 WL 80494, 1991 U.S.Dist. LEXIS 6326 (E.D.Pa. May 8, 1991), the court applied *Fitchik*'s three-pronged test and ruled that the Chester Housing Authority does not qualify for eleventh amendment immunity. As noted in *Artwell*, a Pennsylvania housing authority is not dependent upon the state for funding, has a separate corporate existence despite "exercising public powers of the Commonwealth as an agency thereof", 35 P.S. § 1550, and wields a considerable degree of autonomy over its appointed functions. Especially because the first (funding source) factor is the most important, *Fitchik*, 873 F.2d at 659, Pennsylvania housing authorities do not qualify for eleventh amendment immunity. Thus, plaintiffs are not barred from bringing suit against PHA. *See also Bolden v. Southeastern Pennsylvania Transportation Authority*, 953 F.2d 807 (3d Cir.1991) (SEPTA does not qualify for eleventh amendment immunity).

PHA's second argument for general dismissal of the counts lodged against it is based upon 42 Pa.C.S.A. § 5522, which states in pertinent part:

---

**22.** Here, plaintiffs allege that "the City and PHA individually and/or jointly owned or subsidized housing located throughout the City of Philadelphia, and such defendants were charged by law with the duty of operating, maintaining, managing and rendering such housing safe for occupancy and use." Amended Complaint at ¶ 170. As such, plaintiffs have specifically stated a claim against the City, as they failed to do in Counts V–VIII.

**23.** The City has not moved to dismiss Count XIV.

**24.** The eleventh amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects or any Foreign State." U.S. Const. amend. XI. The eleventh amendment has also been construed to bar a plaintiff from bringing an action in federal court against his or her own state of citizenship. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

Within six months from the date that any injury was sustained or any cause of action accrued, any person who is about to commence any civil action or proceeding within this Commonwealth or elsewhere against a government unit for damages on account of any injury to his person or property under Chapter 85 (relating to matters affecting government units) or otherwise shall file in the office of the government unit, and if the action is against a Commonwealth agency for damages, then also file in the office of the Attorney General, a statement in writing....

42 Pa.C.S.A. § 5522(a)(1). The statute goes on to state that: "If the statement ... is not filed, any civil action or proceeding commenced against the government unit more than six months after the date of injury shall be dismissed...." 42 Pa. C.S.A. § 5522(a)(2). PHA argues that because plaintiffs did not comply with the notice provision, their complaint must be dismissed.

 PHA's argument fails for several reasons. As PHA concedes, the notice provision cannot apply to claims brought under § 1983, which include Counts V–VIII. Nor can it apply where Congress has afforded a private right of action to enforce a federal statute, as in Counts IX and X. In addition, the statute itself states that: "The court shall excuse noncompliance with this requirement upon a showing of reasonable excuse for failure to file such statement." 42 Pa.C.S.A. § 5522(a)(2). Here, such excuse is provided by the reasonable expectation that, in this vast and complex case, notice prior to suit would not serve its intended purpose, namely, the settlement of claims without litigation. Finally, and most important, the notice statute's "reasonable excuse" provision means that a case will not be dismissed absent a showing of prejudice to the defendant. *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 864–65 (3d Cir.1990) (interpreting Pennsylvania case law). Here, there is no showing, nor even a claim, of prejudice. This precludes dismissal of plaintiffs' claims.

Because PHA cannot prevail on its defenses of sovereign immunity or lack of statutory notice, plaintiffs may proceed under Count XIV.

## V. CLAIMS AGAINST CORPORATE DEFENDANTS

### a. Counts III–IV: § 1985/deprivation of constitutional rights

 In Counts III and IV plaintiffs allege that Corporate Defendants have conspired to deprive them of their federal constitutional rights and have thereby violated § 1985. Specifically, plaintiffs allege that Corporate Defendants conspired to "depriv[e] plaintiffs of their constitutional rights to due process of law and equal protection under the law...." Amended Complaint at ¶ 108. As discussed *supra*, however, in connection with Counts I and II, there is no constitutional right to "decent, safe and sanitary housing". Amended Complaint at ¶ 108. *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).

Plaintiffs' response to ARCO's motion to dismiss construes Counts III and IV to include allegations that Corporate Defendants deprived them of federal *statutory* rights, namely, rights under the USHA and LPPPA. In addition to the fact that such an interpretation is not consistent with the pleadings in Counts III and IV of the Amended Complaint, such allegations are insufficient to survive ARCO's motion to dismiss.

 Plaintiffs have not alleged "that the conspiracy [alleged against Corporate Defendants] was motivated by a racial or class-based animus," as is required in asserting a claim under § 1985. *Pratt v. Thornburgh*, 807 F.2d 355, 357 (3d Cir.1986). Generally, plaintiffs have failed to plead Counts III and IV with the specificity required for a federal civil rights claim. Plaintiffs must "allege the specific conduct violating plaintiff's rights, the time and the place of that conduct, and the identity of the responsible [parties]". *Colburn v. Upper Darby Township*, 838 F.2d 663, 666 (3d Cir.1988). This, they have failed to do.

■ Moreover, as discussed *supra* in connection with Counts I–II and V–VIII, the only statutory rights enforceable by plaintiffs are those stemming from the LPPPA and its implementing regulations (also incorporated into the implementing regulations of the USHA). Those rights are only enforceable against HUD and PHA. In addition, they arose after passage of the LPPPA, in 1971. Simply put, neither Corporate Defendants nor anyone else could have conspired as early as the 1950's to deprive plaintiffs of statutory rights which they did not have until the 1970's.

b. *Count XIX: breach of warranties*

Count XIX of the Amended Complaint alleges breach of express and implied warranties. Plaintiffs specifically allege that Corporate Defendants "expressly and impliedly warranted that lead-based paint products were of good and merchantable quality and fit for their intended purpose." Amended Complaint at ¶ 226. Thus, plaintiffs allege breach of the warranty of merchantability, 13 Pa.C.S.A. § 2314, and breach of the warranty of fitness for a particular purpose, 13 Pa.C.S.A. § 2315.

■ Defendant Sherwin–Williams has moved to dismiss Count XIX on a number of grounds. Count XIX must be dismissed as to the Lead Pigment Defendants because only the *seller* of a product is liable for harms which it causes due to breach of warranty. Here, however, it is *lead-based paint* which is alleged to have caused harm to plaintiffs. Because lead pigments are merely component parts of lead-based paint, the manufacturers of the pigments cannot be held liable for seller breach of warranties regarding the end-use product, lead-based paint.

■ Based upon plaintiffs' failure to plead the requisite causal link between the harmful product and its seller, Count XIX must also be dismissed as to the Lead-based Paint Defendants. Plaintiffs do not contend that they can identify the seller (or manufacturer) of any given lead-based paint applied to a PHA unit. Rather, they seek to proceed with their complaint based upon the allegation that "[a]t all times relevant, the corporate defendants ... accounted for practically the entire production of lead pigments and lead paint in the United States." Amended Complaint at ¶ 39. This allegation is insufficient to sustain their claim of breach of seller warranties. As discussed *infra,* it is also insufficient to defeat Corporate Defendants' motions to dismiss the remaining (tort) counts of the Amended Complaint.

c. *Counts XVII–XVIII and XX–XXII: theories of individual tort liability*

Various of the Corporate Defendants have moved to dismiss Counts XVII–XVIII (negligent product design and negligent failure to warn) and XX–XXII (strict products liability, fraud and misrepresentation, and intentional tort) on a number of grounds. It is unnecessary to address the full gamut of Corporate Defendants' arguments given the above-mentioned inability of plaintiffs to identify the *specific* manufacturers of the allegedly harmful products. Proximate cause is a required element of each of these counts, which sound in various theories of individual tort liability. Absent proximate cause, there can be no liability under any of the theories advanced in Counts XVII–XVIII or XX–XII.[25]

---

**25.** There is a special kind of proximate cause requirement for Count XXI (fraud and misrepresentation), whose essential elements are:

1. a misrepresentation;
2. a fraudulent utterance thereof;
3. an intention by the maker that a recipient will thereby be induced to act;
4. justifiable reliance by the recipient upon the misrepresentation; and
5. damage to the recipient as the proximate result of the misrepresentation.

*Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 296 (3d Cir.1991) (citations omitted). According to this standard, plaintiff must demonstrate that a specific statement *caused* a specific harm. Plaintiffs here do not meet that standard, especially because "the circumstances constituting fraud ... shall be stated [in the complaint] with particularity." Fed.R.Civ.P. 9(b) ("Rule 9(b)"). There is no (sufficiently specific) allegation in the Amended Complaint that defendants' promotional campaign *induced justifiable reliance* on purchasers of lead-based paint subsequently applied to plaintiffs' units.

### d. *Counts XXIII–XXVI: theories of joint and several liability*

In Counts XXIII–XXVI plaintiffs seek to avoid the implications of the absence of proximate causation by pleading four theories of joint and several liability.

#### (1) Count XXIII: civil conspiracy

■ Plaintiffs bringing a civil conspiracy action under Pennsylvania law must show "that two or more persons combine[d] or enter[ed into] an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." *Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 277–78, 505 A.2d 973, 980 (1985) (citing *Slaybaugh v. Newman*, 330 Pa.Super. 216, 221, 479 A.2d 517, 519 (1984)). In *Burnside*, plaintiffs sued several pharmaceutical companies which manufactured diethylstilbestrol ("DES"), a drug given to pregnant women to prevent miscarriages. Plaintiffs, daughters of women who had used DES, alleged that the use of DES by their mothers had caused them to develop medical problems cancer years later.

The *Burnside* court cited with approval two DES cases in other jurisdictions whose civil conspiracy law is similar to that of Pennsylvania. *See Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (D.S.C.1981); *Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984), *cert. denied sub nom.*, *E.R. Squibb & Sons, Inc. v. Collins*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). In *Ryan* and *Collins*, the courts dismissed the civil conspiracy counts because there were no allegations of a specific agreement to commit a criminal act or an intentional tort. The *Burnside* court cited the same deficiency in the action before it and likewise dismissed the civil conspiracy claim, concluding with language equally applicable to this case:

> Like the DES daughters in *Ryan* and *Collins*, the plaintiffs in the instant case have failed to allege the manner in which a conspiratorial scheme was devised and carried out. The complaint contains no averments of meetings, conferences, telephone calls, joint filings, cooperation,

consolidation, or joint licensing.[26] The plaintiffs have alleged no more than a contemporaneous and negligent failure to act. This was insufficient to state either a conspiratorial agreement or the requisite intent to cause injury.

*Burnside*, 505 A.2d at 982. Here, too, plaintiffs have alleged, at most, "a contemporaneous and negligent failure to act," *Id.* Such an allegation does not constitute a valid claim of civil conspiracy.

#### (2) Count XXIV: concert of action

■ Plaintiffs' claim for concert of action arises under § 876 of the Restatement (Second) of Torts, which provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Section 876 imposes liability upon one who acts as a co-conspirator or as an accomplice to another wrongdoer. Under Pennsylvania law, § 876 imposes liability only where the plaintiff can specifically identify both the manufacturer of the injury-producing product (the wrongdoer) and the person who acted as the wrongdoer's co-conspirator or accomplice. *Burnside*, 505 A.2d at 982–83. *See also Cummins v. Firestone Tire & Rubber Co.*, 344 Pa.Super. 9, 495 A.2d 963 (1985); *Kline v. Ball*, 306 Pa.Super. 284, 452 A.2d 727 (1982). Thus, plaintiffs again run afoul of the proximate cause requirement. Indeed, the inability of plaintiffs to identify the specific manufacturers of specific lead-based paint underscores the reason why Pennsylvania and

---

**26.** Here, there was cooperation to the extent that the corporate defendants coordinated pro-motional efforts through the LIA, but this type of joint effort envisioned in *Burnside*.

other courts have refused to apply the concert of action theory in toxic tort cases.

One such case, cited approvingly in the *Burnside* decision, is *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980). The following language from *Sindell* exemplifies the disallowance of a concert of action theory and applies equally to this case:

> What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each other's testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experiences and methods of others making the same or similar products. Application of the concept of concert of action to the situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant.

*Burnside*, 505 A.2d at 984 (quoting *Sindell*, 163 Cal.Rptr. at 141, 607 P.2d at 932–33).

### (3) Count XXV: enterprise liability

Thus far, all of the counts lodged against Corporate Defendants are subject to dismissal. However, under each of the two remaining counts of joint and several liability, plaintiffs seek to revive some of their earlier claims of individual tort liability. Each of those claims depended, in part, upon plaintiffs' ability to allege proximate causation, which they have not done. Under the theories of enterprise and market share liability, however, the traditional causation requirement is relaxed. Under such theories, it is possible to name most or all of a given product's manufacturers and allege industry-wide liability. Thus, if plaintiffs can proceed under either of these theories, then they may overcome the problem of lack of proximate causation.

To prevail under the theory of enterprise liability a plaintiff must show that:

(1) the injury-causing product was manufactured by one of a *small* number of defendants in an industry; (2) the defendants had joint knowledge of the risks inherent in the product and possessed a joint capacity to reduce those risks; and (3) each of them failed to take steps to reduce the risk but, rather, delegated this responsibility to a trade association.

*Burnside*, 505 A.2d at 984 (emphasis in original). In ruling on plaintiffs' claim of enterprise liability, the *Burnside* court considered two cases, one in which this theory was allowed, *Hall v. E.I. DuPont De Nemours Co.*, 345 F.Supp. 353 (E.D.N.Y.1972), and one in which it was disallowed, *Sindell v. Abbott Laboratories, supra.*

In *Hall*, plaintiffs were children who had been injured in accidents with exploding blasting caps. Plaintiffs could not identify the makers of the caps but sued six manufacturers who comprised virtually the entire industry. It was alleged that defendants adhered to industry-wide safety standards and had delegated responsibility for developing safer product designs to their trade association. The court ruled that, under these circumstances, plaintiffs stated a cause of action against defendants.

In *Sindell*, the court distinguished the facts of the *Hall* case and disallowed a cause of action which depended upon the theory of enterprise liability. The court noted first that DES manufacturers numbered over two hundred, far more than the defendants in *Hall*. The *Sindell* court also noted an absence of evidence that the defendants had delegated safety responsibility to a common trade association, and it noted that the government was involved in regulating the DES market, whereas the *Hall* defendants were exclusively self-regulated. Based upon these various distinctions, the *Sindell* court dismissed the enterprise liability claim. The *Burnside* court, also faced with a series of DES claims, followed suit.

In certain respects, the claims of the City and PHA more closely resemble that of the plaintiffs in *Hall*. Plaintiffs have sued a relatively small number of manufacturers and have alleged that "[a]t all relevant

times, the corporate defendants ... accounted for practically the entire production of lead pigments and lead paint in the United States." Amended Complaint at ¶ 39. During many of the earlier years in question, the government was not involved in regulating lead pigments and lead-based paint. Rather, defendants had joint knowledge of the safety (or lack thereof) of their products and worked together to develop safety standards (or not to develop them) and to promote their products.

However, plaintiffs have not alleged the third element mentioned above, the delegation of safety responsibility to a trade association. According to the allegations set forth in the Amended Complaint, the LIA acted exclusively as the lead pigment/lead-based paint industry's *promotional agent*. Amended Complaint at ¶¶ 59–72. All of the factual allegations concerning the LIA describe the marketing, lobbying and research which it conducted in order to improve the public image of lead-based paint. These activities are distinct from developing safety standards for defendants' products. Thus, the element of delegation of safety responsibility is not present.

More fundamentally, this court in unwilling to recognize a novel theory of liability where the Pennsylvania state courts have not chosen to do so. Because this case arises under diversity jurisdiction, Pennsylvania state law controls. In *Cummins v. Firestone Tire & Rubber Co., supra,* the Superior Court rejected the theory of enterprise liability on several grounds. Granted, the *Cummins* court rejected the theory of enterprise liability on the ground that plaintiff did not allege that it had sued virtually all of the truck wheel rim manufacturers in the industry. Here, plaintiffs have made the necessary allegation.

However, the *Cummins* court *also* rejected the claim of enterprise liability on the independent ground that there was no precedent in Pennsylvania state law for recognizing it. As the court stated, enterprise liability "has heretofore not been recognized by the courts of this Commonwealth as affording a basis for relief to an aggrieved plaintiff, and will not now be so adopted." *Cummins,* 495 A.2d at 971. Indeed, the court noted that enterprise liability "as embodied in *Hall* has now been rejected by virtually every other jurisdiction confronted with this issue." *Id.* at 971 n. 6. *See also Santiago v. Sherwin–Williams Co.,* 794 F.Supp. 29 (D.Mass. 1992) (rejecting application of enterprise liability to Massachusetts lead-based paint case).

The court went on to quote with approval a New Jersey appellate court which similarly dismissed such a claim: "Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate [sic] court. The appropriate tribunal to accomplish such drastic change is either the Supreme Court or the Legislature." *Id.* (quoting *Namm v. Charles E. Frosst & Company,* 178 N.J.Super. 19, 427 A.2d 1121, 1129 (N.J.Super.1981)). *See also Burnside v. Abbott Laboratories, supra.* If a state appellate court is not the correct tribunal for recognizing a drastic change in state law, then neither is a federal district court sitting in diversity.

This deferential approach is reinforced by *Robertson v. Allied Signal, Inc.,* 914 F.2d 360 (3d Cir.1990), an asbestos case in which the Third Circuit noted:

> While it is clear that the Pennsylvania Supreme Court has not considered a case on all fours with this one, it has definitively established what a plaintiff is required to prove in order to prevail in a products liability action. In particular, the court has required that a plaintiff demonstrate that his harm was proximately caused by the product of a particular defendant. [*Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975).]

*Robertson,* 914 F.2d at 379. After surveying Pennsylvania's legal landscape for any signs that this requirement might be relaxed in the near future, the court concluded: "We are unable, however, to ascertain any trend in the law of Pennsylvania toward an expansion of liability on the part of manufacturers of asbestos through re-

laxation of the burden of proof relative to causation." *Id.* at 380.

Nor has this court detected any such trend which would justify the recognition of enterprise liability under Pennsylvania state law. Rather, this court finds that the proximate causation requirement remains an essential part of Pennsylvania tort law, especially in the area of products liability. The requirement of proximate causation serves as a key evidentiary safeguard which prevents a consumer from hailing every manufacturer into court no matter where the injurious product came from and no matter what chain of distribution it followed. There are no indications that the Pennsylvania Supreme Court is prepared to abandon that safeguard.

(4) Count XXVI: market share liability

■ The theory of market share liability was first recognized in *Sindell v. Abbott Laboratories, supra.* Liability under this theory is premised upon the notion that defendants sold fungible products identical to the one that harmed plaintiff, and that plaintiff should be able to recover from defendants based upon their market share and regardless of actual causation. Although the *Sindell* court ruled, as discussed *supra*, that the plaintiffs in that case could not satisfy the requirements of enterprise liability theory, it allowed them to proceed under the similar but nonetheless distinct theory of market share liability.

■ Distinct as they are, however, the Pennsylvania courts have rejected them because of what they hold in common: the abandonment of the requirement of proximate causation. The court stated in *Cummins*, 495 A.2d at 972, that, "once again, we are confronted with a cause of action novel to the courts of this Commonwealth." *See also Burnside*, 505 A.2d at 985–86. A survey of Pennsylvania state law, such as that conducted by the Third Circuit in *Robertson*, does not support the recognition of a novel products liability theory which would abandon the requirement of proximate causation. As in the case of enter-

prise liability, this court will not sanction a theory of liability which the Pennsylvania courts have declined to recognize.

One lower Pennsylvania court decision deserves discussion because it applied a related theory, alternative liability, in such a way that it closely resembled market share liability.[27] In *Erlich v. Abbott Laboratories*, 5 Phila. 241 (1981), the Court of Common Pleas applied the theory of alternative liability in the context of a DES case. As set forth in § 433B(3) of the Restatement (Second) of Torts, the theory provides:

> [W]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused them harm.

The Pennsylvania Supreme Court sanctioned this theory of liability in *Snoparsky v. Baer*, 439 Pa. 140, 266 A.2d 707 (1970). *See also Sommers v. Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (1974).

In *Snoparsky*, the Pennsylvania Supreme Court followed the leading case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), in which a man was accidentally shot by one of this two hunting companions. Both companions had fired their guns, but plaintiff could not tell which one had actually hit him. The court ruled that plaintiff could hold both of his companions liable, and force them to prove which one actually fired the injurious shot.

In *Snoparsky* the plaintiff sued a group of children, all of whom had been hurling rocks at her before she was struck by one of them. The court, following in the tradition of *Summers v. Tice, supra*, ruled that the plaintiff could sue all of the rock-hurling children under the theory of alternative liability, since it was clear that one of them had harmed her, although she could not say which one. In *Sommers v. Hessler, supra*, the Superior Court ruled likewise where plaintiff was injured by one of a group of children shooting spitballs at him on a school bus.

**27.** *See infra* note 30.

The *Erlich* decision extended the theory of alternative liability into the realm of toxic torts and allowed plaintiff to state a cause of action against DES manufacturers. The court relied upon the fact that plaintiff had joined approximately 90% of the local DES manufacturers, and that all of the defendants had allegedly placed an identical, defective product on the market. Plaintiffs have made similar allegations in this case, although they allege market share on a national, rather than local, basis. Thus, if *Erlich* represents Pennsylvania law, then plaintiffs are entitled to proceed under a theory of alternative liability.

This court does not believe, however, that *Erlich* represents what would most likely be the position of the Pennsylvania Supreme Court, and it is the decision of the state's *highest* court which this court must try to predict. *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981).

Neither the Pennsylvania Supreme Court nor Superior Court has approved the application of alternative liability outside the narrow setting of *Snoparsky* and *Sommers*, both of which, like *Summers v. Tice* before them, involved a small number of on-the-scene individuals hurling projectiles at plaintiff, where one such projectile found its mark. Only *Erlich* has extended this theory to the vastly more complex, uncertain, and far-reaching world of toxic torts. On the Superior Court level, the *Cummins* decision distinguished *Erlich*, but did not explicitly affirm or reject it.[28] On the other hand, the *Burnside* case, which, like *Erlich*, was a suit seeking damages for DES-inflicted injuries, generally rejected theories of liability which would bypass the traditional requirement of proximate causation.[29]

The basic problem with extending alternative liability into the realm of toxic torts

is that it signals a further erosion of the element of causation which still exists, albeit in modified form, in the *Summers v. Tice* paradigm. The standard set forth in § 433B(3) requires that "it is proved that harm has been caused to the plaintiff" by one of the defendants. In other words, plaintiff is certain and can prove that *one* of the defendants is responsible for a *given, specific incidence* of harm, but does not know *which* defendant is responsible. In *Summers v. Tice, Snoparsky*, and *Sommers*, it was certain that one of the defendants had caused the harm because plaintiff had joined all possible defendants. Only at that point did the courts decide that it was fair to shift the evidentiary burden to the defendants.

Applying alternative liability analysis to a case like this represents a radical extension of tort liability doctrine. Here, plaintiffs have not sued the entire class of possible tortfeasors. Rather, plaintiffs allege that "[a]t all relevant times, corporate defendants ... accounted for practically the entire production of lead pigments and lead paint in the United States." Amended Complaint, ¶ 39. Thus, they fail to meet the basic requirement of § 433B(3) that *all* potential tortfeasors be named as defendants. Moreover, their allegation cites the United States market at large. Even in *Erlich*, the court focused on the fact that plaintiffs had named "those manufacturers who marketed approximately 90% of the DES *in the Philadelphia area." Cummins*, 495 A.2d at 972 (emphasis added).

More fundamentally, as with the theories of enterprise and market share liability, Pennsylvania products liability law does not support the abandonment of the requirement of proximate causation which would be required to apply alternative liability to this case. Again, *Burnside, Cummins*, and *Robertson* demonstrate that this

---

28. Other cases have distinguished *Erlich* without explicitly affirming that it represents Pennsylvania law. *See, e.g., Pennfield Corporation v. Meadow Valley Electric, Inc.*, 413 Pa.Super. 187, 604 A.2d 1082 (1992); *Long v. Krueger, Inc.*, 686 F.Supp. 514 (E.D.Pa.1988); *Klein v. Council of Chemical Associations*, 587 F.Supp. 213 (E.D.Pa. 1984). Nor does the fact that various courts have distinguished *Erlich* from the cases before

them mean that they agree with its reasoning, since courts often prefer to distinguish a case rather than criticize it.

29. Liability based specifically upon the theory of alternative liability was not pressed on appeal. *Burnside*, 505 A.2d at 978 n. 1.

requirement remains an essential part of Pennsylvania products liability law. *Summers v. Tice, Snoparsky,* and *Sommers,* apply the principle of alternative liability in the limited arena of personal negligence (or intentionally tortious behavior), where all of the (few) potential tortfeasors are known and named as defendants. *Erlich* alone is insufficient precedent for this court to predict that the Pennsylvania Supreme Court would sanction the theory of alternative liability in this case and thereby upset the *status quo* as expressed in *Burnside, Cummins,* and *Robertson.*

In fact, other district courts have implicitly challenged the ruling in *Erlich.* In *Vigiolto v. Johns–Manville Corp.,* 643 F.Supp. 1454 (W.D.Pa.1986), the court noted the existence of the *Erlich* decision but nevertheless dismissed the alternative liability claim brought against several asbestos manufacturers, concluding: "It follows, therefore, that in order to invoke § 433B(3) the plaintiff must name as defendants *all* who could have caused the complained of injury." *Id.* at 1457 (emphasis added). The *Vigiolto* court correctly focused on § 433B(3)'s requirement that all possible tortfeasors be joined, underscoring the fact that the *Erlich* court misapplied that section.[30]

In *Chelton v. Keystone Oilfield Supply Co., Inc.,* 777 F.Supp. 1252 (W.D.Pa.1991), the court allowed plaintiff to proceed on the theory of alternative liability, citing the factors relied upon in *Erlich* and concluding that such factors were present in the case before it. On the facts, however, the case before it was nothing like the case in *Erlich* (or the case here). Rather, plaintiff alleged that he had been injured on an oil rig as the result of a defective snap hook which broke and caused him to fall. The court concluded:

> We must emphasize that this decision should not be read to apply universally

the theory of alternative liability in strict liability cases. This is a unique case. The third party plaintiff has presented substantial evidence to suggest that a single manufacturer produced the product in question....

> This is not a case where the plaintiff has made no effort to determine which manufacturer created the product and sued all possible manufacturers. Nor is this a case where it would be impossible to determine which party is liable. A substantial factual question remains as to which third-party defendant sold this snap hook. This case simply shifts the burden of proving which party sold the hook to the companies which have the information readily at hand.

*Id.* at 1258–59. This language carefully elaborates the purpose of § 433B(3): to impose an evidentiary burden shift on defendants, one of whom *must* be the tortfeasor responsible for the harm inflicted in a specific event, where such a burden shift will help to identify the actual tortfeasor.

In the instant case, however, plaintiffs have not sued *all* possible tortfeasors, and they have impliedly conceded that it is impossible to tell whose lead pigment or lead-based paint ended where. Aside from *Erlich,* there are no decisions from the Pennsylvania courts which even suggest that the theory of alternative liability should apply in a toxic torts context. In the face of contrary indications, this court finds *Erlich* too thin a reed upon which to rely for precedential support and rejects its alternative liability/*de facto* market share approach.

An appropriate order follows.

### ORDER

AND NOW, this 27th day of August, 1992, it is hereby ORDERED that:

1. The motion to dismiss filed by the United States, the United States Depart-

---

**30.** It is in this misapplication that the *Erlich* decision applied a theory akin to market share liability, since courts approving that theory have not necessarily required that all possible defendants be named. In addition, "[a]lthough the *Erlich* court proceeded under a different theory, the factors relied upon by that court were very

similar to those deemed to be pivotal by the court in *Sindell,*" which first applied the theory of market share liability. *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 495 A.2d 963, 972 (1985). The *Erlich* court thus used the theory of alternative liability to sneak market share liability in through the back door.

ment of Housing and Urban Development, and Jack Kemp is GRANTED. Specifically, Counts I–II, V–VIII, and XV–XVI are DISMISSED as to these defendants.

2. The motion to dismiss filed by Philadelphia Housing Authority is GRANTED in part and DENIED in part. Counts I–II, XIII, and XV–XVI are DISMISSED as to this defendant.

3. The motion to dismiss filed by the City of Philadelphia is GRANTED. Counts I–II and V–X are DISMISSED as to this defendant.

4. The motions to dismiss filed by Atlantic Richfield Company, Duron, Inc. and NL Industries, Inc. are GRANTED. Counts III–IV and XVII–XXVI are DISMISSED as to all Corporate Defendants, including the Lead Industries Association.

5. All other motions to dismiss are DENIED as moot.